IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ : | Civil Action |
| ROBERT JACKSON : | (capital habeas corpus) |
| : | |
| Petitioner, : | |
| : | No. _____ |
| v. : | |
| : | |
| STANLEY W. TAYLOR, JR., : | |
| Commissioner, Delaware Department of : | |
| Corrections; PAUL HOWARD, Bureau : | |
| Chief, Delaware Bureau of Prisons; : | |
| THOMAS L. CARROLL, Warden, : | |
| Delaware Correctional Center, : | |
| : | |
| Respondents. : | |
| _____ | |

**PETITION FOR A WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**

MICHAEL WISEMAN
BILLY H. NOLAS
REBECCA BLASKEY
SHAWN NOLAN
DAVID WYCOFF
Assistant Federal Defenders
MAUREEN K. ROWLEY
Federal Defender
Federal Community Defender Office
For the Eastern District of Pennsylvania
Suite 545 West - Curtis Center
601 Walnut Street
Philadelphia, PA 19106

Dated: April 2, 2007

# TABLE OF CONTENTS

A.  THE NEED FOR AN EVIDENTIARY HEARING  . . . . . . . . . . . . . . . . . . . . 2

B.  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1.  The State's Case at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    2.  The Prosecutor's Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    3.  The New Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.  PRIOR PROCEEDINGS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.  STATEMENT REGARDING PENDING STATE COURT
    PROCEEDINGS, LACK OF EXHAUSTION,
    AND THE NEED FOR ABEYANCE/SUSPENSE  . . . . . . . . . . . . . . . . . . 24
    1.  Petitioner's Claims Are Not Exhausted  . . . . . . . . . . . . . . . . . . . . . 25
    2.  Petitioner Is Filing this Petition Now to Avoid a Statute of Limitations
        Barrier That Could Arise from a Post-Exhaustion Filing  . . . . . . . . 25

E.  THIS PETITION IS TIMELY UNDER 28 U.S.C. § 2244(d)  . . . . . . . . . . . 29

F.  THIS PETITION SATISFIES 28 U.S.C. § 2244(b)
    (CONCERNING SECOND HABEAS PETITIONS) . . . . . . . . . . . . . . . . . 33
    Diligence – § 2244(b)(2)(B)(i)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Innocence – § 2244(b)(2)(B)(ii)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    1.  Innocence of the offense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    2.  Innocence of the death penalty  . . . . . . . . . . . . . . . . . . . . . . . . . . 46

G.  CLAIMS FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CLAIM I.    PETITIONER'S CONVICTION AND DEATH SENTENCE VIOLATE THE EIGHTH
            AND FOURTEENTH AMENDMENTS BECAUSE HE IS INNOCENT. . . . . . 51

CLAIM II.   PRIOR COUNSEL PROVIDED DISLOYAL, CONFLICTED AND INEPT
            REPRESENTATION AND PETITIONER'S RIGHT TO COUNSEL WAS
            VIOLATED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CLAIM III.  THE PROSECUTION WITHHELD EVIDENCE AND ALLOWED MISLEADING

AND FALSE TESTIMONY TO GO UNCORRECTED. . . . . . . . . . . . . . . . 64

CLAIM IV.    PETITIONER WAS DENIED DUE PROCESS WHERE THE SENTENCING JUDGE
RELIED UPON A PSYCHOLOGICAL OR PSYCHIATRIC REPORT THAT WAS
NOT DISCLOSED TO THE DEFENSE; WHERE PETITIONER HAS BEEN
DENIED ACCESS TO HIS OWN PRISON MEDICAL RECORDS; AND WHERE
THERE WAS JUROR MISCONDUCT BUT THE STATE HAS DENIED
PETITIONER ACCESS TO THE JURY TO INVESTIGATE THE MISCONDUCT.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

H.    PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

iii

Petitioner, ROBERT JACKSON, through counsel, files this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner's conviction and death sentence resulted from violations of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner was eighteen years old at the time of the offense for which he stands convicted and sentenced to death.  Petitioner is innocent of the capital crime.  He is not death-eligible, i.e., he is innocent of the death penalty.  The capital conviction and death sentence resulted from the State's non-disclosure of material exculpatory and impeachment evidence, and from the State's failure to correct misleading and false testimony.  The prior defense lawyers breached their duty of loyalty to Petitioner and had conflicts of interest denying Petitioner both assistance and effective assistance from counsel.  The state court which sentenced Petitioner to death used mental health information that was not disclosed to the defense, and the state court has not allowed Petitioner access to information about juror misconduct or even access to his own prison medical records.

The truth about Petitioner's case has never been told in any court.  The facts demonstrating Petitioner's innocence and the constitutional violations that led to his

---

[1]All emphasis herein is supplied unless otherwise indicated.  Parallel citations usually are omitted.  The documents cited are included in the Appendix filed with this Petition.

1

unjust conviction and death sentence only recently came to light.[2]

## A.  THE NEED FOR AN EVIDENTIARY HEARING

This case presents fact-intensive issues, both procedural and substantive, concerning innocence, diligence, non-disclosures of pertinent information, and constitutional error, that require an evidentiary hearing for fair resolution.  See Townsend v. Sain, 372 U.S. 293, 312-19 (1963) (hearing appropriate when there is a material dispute); Smith v. Freeman, 892 F.2d 331, 338 (3d Cir. 1989) (in determining whether a hearing should be held, court must accept petitioner's allegations as true, and view those allegations in the light most favorable to petitioner).

A hearing is necessary as to the substantive and procedural issues in this case. There are no procedural barriers to an evidentiary hearing. Petitioner cannot be

---

[2]Undersigned counsel's office (the Federal Community Defender for the Eastern District of Pennsylvania) was approved by the Administrative Office of the United States Courts to begin work on Delaware capital cases in late March 2006. (Our office was asked to become involved in Delaware capital cases by the American Bar Association, the Federal Defender for Delaware, and the Administrative Office of the United States Courts.)  Our office entered an appearance in the Third Circuit on April 10, 2006, and filed the certiorari petition and a civil rights action on Petitioner's behalf, both in May 2006.  A Rule 61 state court post-conviction action in the Delaware Superior Court, submitting the new evidence we developed, was filed by state court counsel (Thomas Foley, Esq.) on October 19, 2006.  The facts submitted through this petition came to light after the undersigned became involved in Petitioner's case.

deemed to have "failed to develop the factual basis of a[ny] claim in State court proceedings," 28 U.S.C. § 2254(e)(2), since the claims presented herein are now *pending in state court*, see § D, infra, where Petitioner has requested an evidentiary hearing and is trying to "develop the factual basis" for his claims.  Moreover, many of the issues that require evidentiary development, including diligence and innocence, see §§ E-F, infra, concern Petitioner's request for this Court's review on this second habeas petition.  Section 2254(e)(2) does not apply to such issues and the federal court has wide authority to hold a hearing.  See Cristin v. Brennan, 281 F.3d 404, 416 (3d Cir. 2002) (AEDPA's restrictions on federal evidentiary hearings do not apply to procedural matters regarding the federal court's power to hear a petitioner's claims).

## B.  STATEMENT OF THE CASE

Before trial, Petitioner's first lawyer, Joseph Hurley, moved to withdraw from the case and told Judge Bifferato – who would preside at trial, rule on motions, and ultimately make the life-or-death sentencing decision – that Hurley had an "*absolute sense of revulsion toward the defendant*."  Transcript, State v. Jackson, Motion to Withdraw as Counsel (11-10-92) at 4-5. In the presence of the prosecutor and codefendant Anthony Lachette's lawyer, Hurley told Judge Bifferato that he had not met with Petitioner for weeks due to the "emotional strain" meeting such a man had on Hurley.  Id. Hurley also told Judge Bifferato, the prosecutor, and the codefendant's

3

lawyer that Petitioner was *guilty* and "*ought to die*." Id. at 5.  Hurley said these things at "side bar," so that the Judge, the prosecutor and Lachette's lawyer could hear them, but his client, Petitioner, could not.  The transcript of the "side bar" conference was then *sealed*.  Petitioner had no chance to challenge what his "defense lawyer" stated about him and his guilt to the Judge who would preside and sentence, in the presence of the prosecutor who would cut a deal with codefendant Lachette.[3]

Hurley violated every tenet of loyalty and advocacy. *And Hurley was wrong – Petitioner did **not** commit the murder.*

Petitioner's codefendant, Anthony Lachette, committed the murder.  The evidence that shows Lachette's guilt and Petitioner's innocence was not presented to the courts earlier because it was withheld by prosecutors and because of the conflicts and utter ineffectiveness of the lawyers previously involved.  Further, the jury never learned that key State witnesses lied about the benefits they received in exchange for their testimony against Petitioner.

Defense attorney Hurley proclaimed that his client was guilty and ought to die.  Codefendant Lachette blamed Petitioner and maneuvered his way to a deal.  The

---

[3]Judge Bifferato should have recused himself, but did not.  Moreover, Judge Bifferato never told subsequent defense counsel what he had heard.  To the contrary, the Judge ordered that the transcript of this proceeding be sealed, and it remained undisclosed throughout the direct appeal and the prior post-conviction and habeas litigation.

4

prosecutors latched onto the theory that codefendant Lachette was not guilty but Petitioner was. They turned potential informant witnesses into state agents. Deals were covered up. What witnesses knew about Lachette's guilt never got to the jury.

And more, Petitioner suffered from a debilitating shoulder dislocation injury that required surgery just months before the offense. This injury made it impossible for Petitioner to have wielded a heavy axe at all, as the State alleged, let alone to have swung it over his head numerous times as the victim's attacker must have done. Witnesses told the prosecutors about this, but this also was suppressed.

The issues in this capital case cry out for review.

## 1.  The State's Case at Trial

The Delaware Supreme Court found that "evidence presented at trial reflected the following events":

> During the afternoon of April 3, 1992, Jackson and Anthony Lachette ("Lachette") decided to burglarize a house in order to obtain money to buy marijuana. Lachette suggested they break into the home of Elizabeth Girardi. Lachette was familiar with the residence since he was acquainted with one of Mrs. Girardi's children. No one was at home when the two broke into the house through the back door. Jackson wore a pair of gardening gloves he had brought with him. Once inside, the two gathered property that included jewelry, rare coins, compact discs, firecrackers, and a camera. After placing the stolen property in paper bags, Jackson and Lachette left the house the way they entered. As they headed toward the driveway, where Jackson had parked the car, they saw Mrs. Girardi, who had arrived home and was walking towards Jackson's car. Lachette decided to flee despite Jackson's attempt to

5

persuade him to stay. Lachette then dropped his bag and ran off, leaving Jackson behind.

After Lachette ran off, Jackson grabbed an ax from a shed and confronted Mrs. Girardi in the driveway.  A struggle ensued, during which Mrs. Girardi fell to the ground, whereupon Jackson struck her several times in the face with the ax.  Jackson then loaded his car with the stolen property.  Before leaving, Jackson noticed that Mrs. Girardi was still alive.  He struck her several more times in the face with the ax, killing her, and then left the scene.  Shortly thereafter, Jackson found Lachette walking along the road and picked him up.  Jackson then told Lachette that he had killed Mrs. Girardi.  Lachette noticed blood on Jackson's gloves and pant legs.  Over the course of the next week, Jackson watched television news reports and spoke with Lachette and James Burton ("Burton"), his roommate and longtime friend, about the Girardi murder. During that time, Jackson told Burton that he had killed Mrs. Girardi.

On April 9, 1992, Burton and Carl Roca ("Roca"), a friend, sold a bracelet stolen in the Girardi burglary to a pawn shop in Elsmere. Pawn shop owners in the area had been alerted by the police to be on the lookout for certain pieces of property stolen from the Girardi residence. The pawn shop owner contacted the police, who, following an investigation, obtained warrants authorizing the search of Burton's and Roca's residences and also authorizing the police to take Burton and Roca into custody to obtain clothing, fingerprints, and hair and blood samples from their persons.

When the police arrived at Burton's residence, they learned from his parents that he had moved out and was living with Jackson. Conducting surveillance in the area near Burton's and Jackson's apartment, police observed Burton and two companions enter a car and drive off.  The police followed, eventually stopping the car for two motor vehicle violations.  Lachette was driving, Jackson was in the front passenger seat, and Burton was in the rear seat.  Upon opening the driver's door, the police observed a 14-inch metal pipe partially concealed between the driver's seat and door.  After Lachette exited the

vehicle, the police folded the driver's seat-back forward to allow Burton access to the door. Upon doing this, a plastic bag containing marijuana was discovered in the folding area where the seat-back and cushion meet. All three of the vehicle's occupants, including Jackson, were then arrested for carrying a concealed deadly weapon and possession of marijuana. Before placing Jackson in a holding cell, the police, pursuant to standard procedures, removed certain articles of property and clothing from his person, including his sneakers. Later that night, when police discovered that Lachette and Jackson were involved in the Girardi burglary/homicide, the sneakers were seized as evidence. The sole of one of Jackson's sneakers was later determined to be consistent with foot prints found at the murder scene.

While in custody on the concealed weapon and marijuana charges, Lachette confessed to his role in the burglary and implicated Jackson in the Girardi murder. Subsequently, he gave a full statement to the police regarding the details of the burglary and Jackson's remarks regarding the murder. Additionally, Burton eventually gave a full statement to police, which included details of Jackson's remarks to him regarding the murder. Both Lachette and Burton testified for the State at trial.

Jackson v. State, 643 A.2d 1360, 1363-64 (Del. 1994) ("Jackson-1").

The trial evidence about "what happened on the day" of the offense "came mainly from Lachette and Burton." State v. Jackson, Sentencing Decision at 9, Bifferato, J. (Oct. 26, 1995). Both Lachette and Burton had *strong motives* to lie, and shift responsibility from themselves to Petitioner. See Jackson v. State, Opinion of Bifferato, J., denying post-conviction relief, at 14 (Aug. 25, 1999) ("Lachette and ... Burton both ... had motives to fabricate stories in order to extricate themselves from

criminal responsibility").[4]

Lachette had good reason to fear that *he* would be accused as the killer. The physical evidence did not exclude Lachette as the killer, and even the *State's evidence* showed that it was *Lachette* who had the most compelling motive to kill: Lachette was the one who targeted the Girardi house for the burglary; Lachette had broken into the house; and Mrs. Girardi *knew Lachette*, but did *not* know Petitioner. Thus, *Lachette* was the one that Mrs. Girardi would have recognized; Lachette had the greatest motive to kill her. But Lachette got to the authorities. He blamed Petitioner. He got special treatment from the State.[5]

The evolution of Lachette's statements to the authorities tells the tale of a calculating man whose story to the police started with feigned complete innocence and progressed toward finger-pointing at Petitioner. All the while, Lachette was gauging how he could best extricate himself.

When the police first told Lachette that they were investigating the murder, he said he had heard about it, said he had gone to school with Mrs. Girardi's son, and

---

[4]Under 28 U.S.C. § 2244(b)(2)(B)(ii), all of the evidence suggesting innocence ("the evidence as a whole") must be considered. Accordingly the Court should consider the new evidence of innocence along with the evidence from earlier proceedings. See § F, infra (discussing § 2244(b)(2)(B)).

[5]Lachette was ultimately sentenced to a total of five years. See Lachette Sentencing Order.

said his mother was very upset because she had been friendly with Mrs. Girardi. 4/10/92 Lachette Statement at 2.  He said he used to visit their house and said that he had no problem talking to the police – "None whatsoever."  Id. at 3.  He feigned ignorance beyond that, saying the story had been all over the press, that he had been following it, and that's all he knew.  Id.

As the police asked more questions, Lachette sought some control over the situation, wanting to know first what the police knew:

> A.    Do you think we, we had something to do with this or you have reason to believe we have or?
>
> Q.    Yeah, you tell me.  We have Bob, we have you.
>
> A.    Yeah for what?
>
> Q.    We have property that was taken out of the Girardi residence.
>
> A.    Who had property taken out of Girardi residence.  No I didn't.  I most certainly did not.  If I do I did not know it was from Girardi residence. ... you can check my car ...

Id. at 4-5.  (Lachette may not have been holding the proceeds, but he knew how they were disposed, because he participated in disposing of them.)

What followed next was Lachette's first version of the events.  He claimed he had driven around with Petitioner – "yeah we took his car, my car stayed home"; they visited Petitioner's sister's house; then they went back to Petitioner's apartment,

where they "hung out and watched TV"; a few other people came by.  Lachette included some friendly conversation about the poor condition of Petitioner's car. 4/10/92 Lachette Statement at 3-6.

The police challenged this tale, suggesting (falsely) that Petitioner had already implicated Lachette.  Id. at 6.  Lachette would not commit until he knew what Petitioner (supposedly) had said: "What are you hearing from him?" Id.  Led further to believe that Petitioner had described the incident, Lachette considered whether he should get a lawyer before saying more, but decided it would be to his advantage to proceed.  He said he and Petitioner "pulled up in his car and ah she came home"; Lachette claimed that he then ran away.  In this version, Petitioner found Lachette and picked him up in the car. "Straight up man," said Lachette, Petitioner "said she couldn't talk." Id. at 9.

The questioning continued.  Lachette said they had stolen things when they were together, but they "left everything lying right there." Id.  As the police asked each new question that incriminated Lachette – e.g., How did they get in the house? Were they wearing gloves? – Lachette began to balk at continuing without a lawyer. The police asked if he understood he was going to be charged with the crime, and his answer was: "As long as I'm not charged with fucking murder." Lachette thought he had extricated himself from a murder charge, but was told that he had not.  Id. at 9-10.

10

Lachette then retained a lawyer who approached the State on his behalf.  On August 26, after his lawyer went to the State with proffered information from Lachette, Lachette met with the authorities again, anticipating that *at worst* he would be convicted of burglary, given his cooperation.  8/26/92 Lachette Statement at 2.

All told, Lachette gave the State four versions of the events.  It is the fourth version that Lachette and the State presented to the jury.  This story included personal admissions only to what could not plausibly be denied – e.g., Lachette knew the Girardis and their home, so he admitted that he had suggested the burglary of the Girardi home and that he directed Petitioner to it; Lachette admitted he broke into the house (he knew he had touched the door without his gloves); Lachette admitted he participated in collecting items from around the house (he knew he touched some items in the house without his gloves).  This version also contains an oddly precise account of the killing, especially strange because Lachette claimed he was not there. To cover himself, Lachette claimed Petitioner confessed the details to him.

Given Lachette's reasons to lie, e.g., he planned the burglary and had a motive to kill the decedent because *she knew him* and could identify him, together with the tortured history of his statements to police, there are questions about his veracity. Much more significantly, as the new evidence shows, he had a very good reason to lie – *he was the killer*.  Nevertheless, Lachette managed  to protect himself and work

out a deal with the State.

James Burton also had good reason to lie. Burton, along with Carl Roca, sold fruits of the Girardi burglary at a pawnshop, using Burton's driver's license as identification. The physical evidence did not exclude Burton (or Roca) as the killer. It was police suspicion and surveillance of Burton that led to the arrest of Lachette and Petitioner. Police stopped the car which carried all three of them. All were charged with possessing the weapon (a 14-inch metal pipe) that was concealed next to Lachette (the driver), and the marijuana that was observed when the driver's seat was moved so that Burton (the back seat passenger) could exit. To extricate himself, Burton would claim at trial that Petitioner made an admission of guilt to him.

As with Lachette, even the trial evidence raises questions about the veracity of Burton's testimony that Petitioner confessed to him on the same day as the murder. In addition to Burton's general interest in extricating himself from the serious charges involved, it seems very unlikely that Burton would have used *his own identification* to pawn a bracelet connected to the crime if Petitioner had actually confessed to him that the crime was murder. As described later, Burton's account is also now belied by new evidence showing Lachette's guilt and Petitioner's innocence.

The State also called a witness who was presented to the jury as a person with *no reason to implicate Petitioner* – Andre Johnson. Johnson testified

12

that Jackson had solicited ... Johnson, a fellow inmate at the Multi-Purpose Criminal Justice Facility (Gander Hill Prison), to kill Burton upon Johnson's release from prison. After Johnson's release, Jackson sent him a letter discussing, in code, Burton's death, along with a photograph of Burton and a map to his residence. Johnson decided not to participate and delivered these materials to the Attorney General's office.

Jackson-1 at 1369. The supposedly "coded" letter to Johnson *does not mention killing Burton*.[6] Thus, Johnson's testimony about the supposed "coded" meaning of the letter was essential to the State's claim that Petitioner had solicited Johnson to kill Burton and was crucial to the State's case. Indeed, the *content* of the letter is *not*

---

[6]The handwritten letter (see Appendix) states, verbatim:

Andre
How's it going? I'm following your advice so things are fine. Since you've left, things seem pretty messed up cause no one to talk too and the state is really trying to fuck me hard. I Hope your right about things getting worse before they get better. JusticE has to prevaiL if not I'll go fucking nuts. I'm glad we had the opportunity to become friends and hopefully if things work out the friendshiP will be benificial to the both of us. My brain and thinking patterns have increased thanks to you if it wasn't for that I don't think I'd still be here. If shit hits the fan, I'm out of this place for good. I pray, I don't have to take that rought but if so I may need help. Well good luck with your legal matters and keep in touch.

Later<br>your walking partner

PS

  I don't know how to
  say every thing I want
  to. Understand?

13

damning. On its face, it is a cry for justice and a suicide threat. The State asserted that this apparently benign letter was in a "code" that could only be unlocked by Johnson's testimony about its supposed meaning. Johnson's *credibility* thus was essential to the State's claim that Petitioner solicited Johnson to kill Burton and the implication that Petitioner therefore was guilty.

Johnson testified that he had open criminal charges, including burglary, theft and weapons charges, which carried a potential sentence of life imprisonment. Tr. 3/23/93 at 338-41. However, Johnson testified steadfastly that he *had not been promised and would not receive any consideration from the State* with respect to the pending charges. Id. at 342. Johnson claimed that his only motivation for contacting the prosecutor and testifying was that Petitioner's alleged request was just "wrong" and Johnson did not want anything to do with it. Id. at 357. When defense counsel pressed Johnson on this topic on cross-examination, Johnson insisted: "*The State ain't giving me nothing*, just like you aren't." Id. at 371.[7]

─────────────────────

[7]In closing argument, the prosecutor, argued strenuously that Johnson had no possible credibility problems because he "was promised nothing" for his testimony:

>    Let's look at Andre Johnson's motivation. We know he was then arrested and reincarcerated and he's facing life in jail. He was promised nothing by the State. The only thing that he got for testifying was that he will not be prosecuted for conspiracy to commit murder. That is the immunity he was given that he will not be prosecuted based upon his testimony.
>
>    And under a rather intense cross examination what did we learn

The new evidence shows that Lachette and Burton, who had obvious reasons to lie, *did lie* – the truth is that Lachette, not Petitioner, was the killer. The evidence also shows that *Andre Johnson lied*, as he now admits.[8] He lied about his deal; he lied about what he believed; and he lied about Petitioner's guilt. He told the prosecutors pre-trial that *Petitioner was innocent and Lachette was the real killer*, but what he knew and told the prosecutors was suppressed.

Thus, the new evidence shows that the jury never heard the truth – that Lachette was the real killer; that Lachette admitted it; that Lachette was a violent, unpredictable drug addict and dealer; that Petitioner physically could not have committed the crime; and that testimony of State witnesses was fabricated.

## 2. The Prosecutor's Argument

In accord with Delaware law, the prosecutor told the jury that only the actual killer was guilty of first degree-murder and subject to the death penalty. In the prosecutor's words:

> Anthony Lachette will be a witness in this case. You will conclude after
> you hear all the evidence, hear all the witnesses, that Anthony Lachette
> pled guilty to burglary second degree and conspiracy second degree

about Andre Johnson? Andre Johnson told you that, look, the State is
giving me nothing. Just like you are giving me nothing.
Tr. 3/29/93 & 3/30/93 at 81.

[8]So did another informant, used only at sentencing, Victor Talmo, as he also
now admits. See Claim III, infra.

15

because that is all Anthony Lachette did. And that the other remaining defendant [Petitioner] seated here today in this courtroom you'll conclude is a cold blooded, remorseless killer.

Tr. 3/16/93 at 27.

Thus, Petitioner became the man responsible, and guilty of capital murder, while Lachette became the State's cooperating witness, and not guilty of murder.

### 3.   The New Evidence

The new evidence shows that Petitioner is innocent of this murder. The new evidence shows that Lachette is the actual killer.

Paul Webber served time with Lachette on the same tier at Gander Hill prison, before Petitioner's trial. *Lachette confessed to Webber that Lachette killed Mrs. Girardi.* "When Lachette got on the tier, he told me that he was the one who killed the lady." Paul Webber Declaration ¶ 2. Webber further describes Lachette as "a very scary guy," who "was using drugs while in jail" and was a "dealer on the outside." Id. ¶ 4.

Another inmate who was in prison with Lachette before Petitioner's trial, Christopher Desmond, states: "I remember a conversation with Lachette on the tier about Joe Hurley, who was Jackson's lawyer. Derrick Johnson was there, too. *Lachette was saying that he was the one who killed the woman.* He always said I did what I had to do. What triggered the conversation was Hurley on television. Lachette

16

always said he was the first one in to talk so everybody blamed Jackson."
Christopher Desmond Declaration ¶ 4. "Lachette would brag about the fact that he
got to the cops first to tell his story so he would get his deal." Id. ¶ 3.

Christopher Desmond's description of Lachette's admissions is corroborated
by (now-Pastor) Derrick Johnson, who was also detained in Gander Hill while
Petitioner and Lachette were awaiting trial. Johnson states that Petitioner always
maintained that he was innocent and Lachette did the killing. Derrick Johnson
Declaration ¶ 4. Lachette threatened Johnson, *admitted that he had already killed
someone*, and stated he would do the same to Johnson. Id. ¶ 3. Johnson describes
Lachette as a bully, arrogant and aggressive. Id. ¶ 2-3. Indeed, everyone on the block
where they were housed knew Lachette was responsible for the killing and that
Lachette was blaming Petitioner to save himself. Id. ¶ 2.

A former cell mate of Lachette, Jonathon Freeman, provides further evidence
that Lachette was the killer. Lachette told Freeman that he knew from the beginning
that he had to get to the prosecutor first to tell his story. Lachette told Freeman that
when the woman drove into the garage, Lachette knew she had to be killed because
she knew him, and he found the axe right there. Lachette admitted to Freeman that
*he was the killer*. Even now, Freeman is afraid of Lachette, because of Lachette's
violent reputation and Lachette's actions in prison. See Declaration of Victor Abreu,

17

Esq. (describing Freeman's account).

Andre Johnson, who testified for the State at trial, always knew that Lachette, not Petitioner, was the killer; and Andre Johnson told this to the prosecutors. Andre Johnson Declaration ¶ 2. They did not want to hear it. Id. ("They didn't want to hear any of that stuff. They obviously didn't want me to say that it was my understanding that the other guy did the killing"). Andre Johnson also told the prosecutors about Petitioner's severe shoulder injury, which would make it impossible for Petitioner to have wielded the axe. Id. None of this information from Johnson was disclosed to the defense.[9]

George Gentry knew Lachette, and provides further insight into Lachette's violent and unpredictable tendencies. He describes Lachette as a violent man, who would "fly off into a rage for no reason." George Gentry Declaration ¶ 6. Lachette was an arrogant bully and was heavily into drugs. "He used steroids ... and was a

---

[9]At the behest of the prosecutors, Andre Johnson testified for the State at trial that Petitioner asked him to get rid of James Burton. At trial, Andre Johnson denied he was receiving any benefit for his testimony. This was false, as he now admits. He now describes his meetings with the prosecutors and explains that he understood he would get a very good deal. See Andre Johnson Declaration ¶ 4. In a pleading he filed in his own case, he stated: "Mr. Barron assured me that my chargies (sic) would be disposed of and that he could not put that in writing because if the defense counsel was to find out about this agreement, it would be used to destroy my credibility." Complaint for Specific Performance, Johnson v. State ¶ 8. See also Claim III, infra (describing Brady violations relating to Andre Johnson).

18

really big guy, much bigger than Bobby [Jackson]. He also used coke, acid and mushrooms." Id. Lachette sold drugs and would brag about getting kids hooked on drugs, and how he could get people to do what he wanted. Id.

Gentry also knew James Burton. Gentry describes Burton as a drug addict and an inveterate liar. "He would lie about really strange things just to make himself look better. He would tell people that he had a better job than he really had .... You just couldn't trust anything James [Burton] said." Id. ¶ 5.

Gentry also knew that Petitioner suffered a severe shoulder and head injury as a result of the car accident shortly before the offense. "He really couldn't do anything with his arm or shoulder after that. He couldn't even raise his arm above his head. He used to like to play baseball but he couldn't pick up or even swing a bat anymore after the accident" Id. ¶ 4. He describes Petitioner as non-violent, respectful and dependable. Id. ¶ 2.

Victor Talmo, a State sentencing witness, *told the police and prosecutors that Petitioner always denied killing the victim.* Petitioner "was always adamant that he didn't do it." Victor Talmo Declaration ¶ 2. In spite of continuous pressure from the police and prosecutors to say that Petitioner confessed, Talmo knew "Jackson always maintained that he didn't kill the woman." Id. ¶ 4. This exculpatory evidence was not provided to the defense.

19

The prosecution also interviewed Angeline Willen, a former girlfriend of Petitioner's. She told them that Petitioner was never violent toward her in any way. Angeline Willen Declaration ¶ 7. She told the prosecution about the severe shoulder and arm injury that Petitioner had suffered, an injury that made it impossible for him to have done the killing. Id. ¶ 4, 7. According to the trial testimony, the killer struck the victim repeatedly with the axe. E.g., Tr. 3/24/93 at 550 (medical examiner's testimony). The condition of Petitioner's shoulder would make such actions by him impossible. According to Willen, and as corroborated by Gentry, supra, and other evidence, see infra, Petitioner "could not do much at all with that arm or shoulder. He was depressed over this shoulder injury. He was always active and played sports. After the accident, he couldn't do anything. He couldn't lift things or swing his arm or lift his arm in the air. He could not use his shoulder or arm to do much of anything." Angeline Willen Declaration ¶ 4; see also Riverside Hospital Records (describing the injury).

As to Lachette, Angeline Willen describes him as a drug dealer and very aggressive: "He was very violent. He would often fly off the handle, slamming doors and throwing things around. He would fly into a rage for no reason." Id. at 5. Moreover, in spite of forceful questioning about Petitioner from the prosecution designed to elicit violent tendencies of Petitioner, Ms. Willen told the authorities that

20

Petitioner was not in any way violent. Id. ¶ 7. The jury heard none of this.

David Gerhardt provides further evidence of Petitioner's innocence. Gerhart was the driver during the "bad car accident" involving Petitioner, in which the "car went off the road and flipped over a few times." David Gerhardt Declaration ¶ 2. Petitioner suffered severe injuries. Gerhardt describes Petitioner's shoulder as "never the same." Id. ¶ 4. "He had no range of motion and wouldn't horseplay at all. I remember Bobby had an operation on his shoulder and wore a bandage for a long time. He was in a lot of pain, and just never the same." Id. This evidence further shows that Petitioner could not have committed the killing. The jury never heard it.

Robert Ashley was another passenger in the car during the accident. He was in the back seat of the truck and remembers the vehicle flipping over five or six times and landing upside down. "When Bobby [Jackson] finally got out of the truck he was very bloody. He was bleeding from his head and arm and feet. I know he hurt his shoulder real bad." Robert Ashley Declaration ¶ 10. Ashley recalls that after the accident Petitioner's shoulder was never the same – he could not lift his arm or play sports. Id. ¶ 7-8. When he visited Petitioner while he was incarcerated pre-trial, Petitioner was still complaining about his shoulder. Id. ¶ 9. Mr. Ashley also knew Petitioner for many years and describes him as respectful and non-violent. Id. ¶ 2-3.

Cathy Barrett offers additional evidence. She knew Petitioner well. She states

that Petitioner was respectful, truthful and dependable.  She never saw him behave violently in any way.  Cathy Barrett Declaration ¶ 2.

Barrett also could have offered evidence concerning State witness James Burton.  She explains that Burton was a liar, a drug addict, a drug dealer and a thief.  Burton "was just one of those people who you knew you couldn't trust and who would do anything to make sure he was okay regardless of other people."  Id. ¶ 5.  The jury never heard the evidence about Burton.

Sharon Montgomery was another close friend of Petitioner.  They grew up together.  She describes him as "sweet and kind" and "the best kind of friend you could have."  Sharon Montgomery Declaration ¶ 2.  She also states that he was always respectful and never "behaved violently in any way."  Id. ¶ 3.  She recalls that he hurt his arm and shoulder severely in the auto accident.  She, too, could have testified that Burton was known to be a liar and was only concerned for himself.  Id. ¶ 5.

Melissa Pullak dated Petitioner for a time.  She states that Petitioner was supportive and sweet, and was never violent in any way toward her.  See Melissa Pullak Declaration. Sandra Younker knew Petitioner since he was two years old.  She notes that he was sensitive and slow to anger.  Sandra Younker Declaration ¶ 2.  When Petitioner was about 15 years old, he babysat Ms. Younker's child.  She

describes him as a "dependable" and helpful person.  Id. ¶ 4.

The jury never heard the exculpatory evidence that has recently been uncovered.  The proceedings that resulted in the capital conviction, death sentence, and affirmances on direct appeal and in prior collateral proceedings were not constitutionally reliable and constitute a miscarriage of justice.

## C.  PRIOR PROCEEDINGS

Petitioner's convictions were affirmed on his first direct appeal to the Delaware Supreme Court.  The Court vacated the (non-unanimous) death sentence and remanded for resentencing.  See Jackson v. State, 643 A.2d 1360 (Del. 1994) ("Jackson-1").  The jury was again not unanimous at resentencing, and Judge Bifferato again imposed a death sentence.  The Delaware Supreme Court affirmed. Jackson v. State, 684 A.2d 745 (Del. 1996) ("Jackson-2").  State post-conviction relief was denied.  Jackson v. State, 770 A.2d 506 (Del. 2001) ("Jackson-3").  Federal habeas corpus relief was denied.  Jackson v. Carroll, 2004 WL 1192650 (D. Del. 5/20/04) ("Jackson-4"), aff'd, Jackson v. Carroll, 161 Fed.Appx. 190, 2005 WL 3477556 (3d Cir. 2005) ("Jackson-5"), cert. denied, 127 S.Ct. 60 (2006).  On May 9, 2006, in conjunction with pending civil rights litigation challenging the lethal injection execution procedures employed in Delaware, the District Court enjoined

Petitioner's execution.  Jackson v. Taylor, No. 06-cv-300-SLR (D. Del.).[10]

## D.  STATEMENT REGARDING PENDING STATE COURT PROCEEDINGS, LACK OF EXHAUSTION, AND THE NEED FOR ABEYANCE/SUSPENSE

The claims here presented are not exhausted.  Counsel submit them now in order to protect Petitioner from the possibility that submitting them later would result in a statute of limitations barrier to review.  Habeas law is ever-changing, and counsel cannot risk Petitioner's life by waiting until completion of exhaustion of state court remedies before filing in federal court.  We therefore ask this Court to hold these proceedings in abeyance or suspense while state court remedies are exhausted.  As described later, the United States Supreme Court and the Third Circuit both have endorsed this approach.

---

[10]Undersigned counsel's office (the Federal Community Defender for the Eastern District of Pennsylvania) was approved by the Administrative Office of the United States Courts to begin work on Delaware capital cases in late March 2006. (Our office was asked to become involved in Delaware capital cases by the American Bar Association, the Federal Defender for Delaware, and the Administrative Office of the United States Courts.)  Our office entered an appearance in the Third Circuit on April 10, 2006, and filed the certiorari petition and a civil rights action on Petitioner's behalf, both in May 2006.  A Rule 61 state court post-conviction action in the Delaware Superior Court, submitting the new evidence we developed, was filed by state court counsel (Thomas Foley, Esq.) on October 19, 2006.

24

## 1.  Petitioner's Claims Are Not Exhausted

Petitioner has filed in the Delaware Superior Court a *Motion for Postconviction Relief Pursuant to Superior Court Rule 61, and Consolidated Points of Law* (dated October 19, 2006), setting forth the newly discovered evidence and claims described herein.  The State sought and was granted additional time to respond.  The State's substantive response is due on April 16, 2007.

Thus, the claims set forth herein are now pending in state court.  Petitioner files the instant petition within one year of the discovery of new evidence in order to protect Petitioner's right to eventual federal habeas review, as set forth immediately below.

## 2.  Petitioner Is Filing this Petition Now to Avoid a Statute of Limitations Barrier That Could Arise from a Post-Exhaustion Filing

Petitioner's pleading in state court is his second state post-conviction petition. Counsel's research indicates that Delaware's post-conviction statute allows for successive petitions under circumstances such as those in Petitioner's case.[11]  Because

---

[11]Delaware Criminal Rule 61(i)(5) provides exceptions to the procedural bars of Rule 61 where the petitioner, as here, raises a "colorable" claim that his conviction or sentence constitute a "miscarriage of justice" or deprivation of "fundamental fairness."  De. Super. Ct.Crim. R. 61(i)(5).  Rule 61(i)(5) "[i]s a general default provision, and permits a petitioner to seek relief if he or she was otherwise procedurally barred under Rules 61(i)(1)-(3)."  Bailey v. State, 588 A.2d 1121, 1129 (Del.1991); see also Younger v. State, 580 A.2d 552, 555 (Del. 1990) (fundamental fairness exception of Rule 61(i)(5) applies where petitioner shows deprivation of a

Petitioner's state post-conviction proceedings are pending, he has not exhausted state court remedies and federal habeas review technically is premature at this time. <u>See, e.g.</u>, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999) ("state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition").

If federal habeas corpus law was predictable, Mr. Jackson would not be compelled to file in federal court at this time, but would await completion of the pending state court proceedings. Unfortunately, federal habeas law keeps changing, and undersigned counsel wish to avoid having this death-sentenced client fall into traps that have ensnared other habeas petitioners.[12] Mr. Jackson is compelled to seek the protection of the federal courts *before* exhausting state court remedies because his failure to do so could forever bar him from obtaining federal habeas review of the claims he is exhausting.

_____

substantial constitutional right).

[12]<u>See</u>, <u>e.g.</u>, <u>Lawrence v. Florida</u>, 127 S.Ct. 1079 (2007) (no federal habeas review in capital case where petitioner believed that time for seeking certiorari review of state court denial of post-conviction relief would toll AEDPA limitations); <u>Burton v. Stewart</u>, 127 S.Ct. 793 (2007) (no federal habeas review of sentencing issues where petitioner believed he had to seek separate federal review of his conviction before his sentence was final); <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005) (no federal habeas review where *pro se* petitioner made a mistake by seeking to exhaust state court remedies that he believed were available, before seeking federal habeas review, and AEDPA limitations period expired during pursuit of state review).

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") has a one year limitations period. See 28 U.S.C. § 2244(d)(1). In recognition of the exhaustion requirement, AEDPA requires the tolling of this one year limitations period for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

As we noted, Mr. Jackson does have pending in state court an "application for State post-conviction or other collateral review with respect to the pertinent judgment or claim," § 2244(d)(2). Thus, if Mr. Jackson could be certain that his currently pending state court application would be deemed "properly filed" within the meaning of § 2244(d)(2), he would not fear the AEDPA limitations period because the AEDPA year is tolled by the pending state proceedings. If that were the case, Mr. Jackson would have no reason to now seek this Court's protection, and would wait until after exhaustion of state remedies before seeking this Court's review, as was the case with the exhaustion requirement before the AEDPA.

To be sure, counsel do believe that Mr. Jackson's state court proceedings *are* "properly filed." However, because of the way the United States Supreme Court has construed the term "properly filed," we will not know if we are right until *after the state courts rule.* See Pace v. DiGuglielmo, 544 U.S. 408 (2005). Under Pace, if the

27

state court rejects Mr. Jackson's pending application as untimely under state law, then Mr. Jackson's state court application would be deemed never to have been "properly filed." The pending state court application then would not toll AEDPA's limitations period. Under Pace, the state courts make the call on the question of what is "properly filed," no matter how arbitrary or unpredictable their ruling may be.

Given these circumstances, counsel cannot risk Mr. Jackson's life by assuming that the state courts will rule, as they should, that Mr. Jackson's state court proceedings are properly filed.

Neither can counsel risk Mr. Jackson's life on the belief that "equitable tolling" of the AEDPA limitations period will be available. The United States Supreme Court repeatedly has declined to address whether equitable tolling is even available under AEDPA. E.g., Lawrence v. Florida, 127 S.Ct. 1079, 1085 (2007) ("We have not decided whether § 2244(d) allows for equitable tolling."). If the Supreme Court were to hold that equitable tolling is not available, Mr. Jackson's failure to seek federal review now would result in forfeiture of the possibility of obtaining federal review.

The claims Mr. Jackson raises are worthy of federal review, and demonstrate that Mr. Jackson should have his rights to federal review preserved if relief is not granted in state court. The Supreme Court and Third Circuit have held that there is a mechanism for preservation of federal habeas remedies in situations such as this –

"suspense" or "abeyance" of the federal litigation pending exhaustion in state court.

See Rhines v. Weber, 544 U.S. 269 (2005); Crews v. Horn, 360 F.3d 146 (3d Cir. 2004).

We therefore file this Petition now, even though federal habeas review is technically premature.  Since state court remedies have not been exhausted, and because even a dismissal without prejudice by this Court could endanger Petitioner's right to seek federal review after exhaustion, federal habeas proceedings should be held in suspense or abeyance pending the outcome of the state court proceedings.

### E.  THIS PETITION IS TIMELY UNDER 28 U.S.C. § 2244(d)

This Petition is timely under AEDPA's limitations period, 28 U.S.C. § 2244(d).

The provisions of the AEDPA statute of limitations that are relevant to Petitioner are:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
> *   *   *
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; [or]
>
> *   *   *
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(B) & (D).

The Administrative Office of the United States Courts first gave undersigned counsel approval to begin working on Delaware capital cases in the last week of March, 2006. Counsel first became involved in Petitioner's case in April-May, 2006, after Petitioner had been scheduled for execution. We entered an appearance in the Third Circuit on April 10, 2006, and we filed for certiorari review in the United States Supreme Court in May of 2006. The new evidence and claims we developed were submitted to the Delaware Superior Court through the pending Rule 61 petition on October 19, 2006.

Petitioner has made a compelling showing that he is innocent of the murder and innocent of the death penalty. The courts have never reviewed the vast array of evidence that proves Petitioner's innocence. Neither have the courts reviewed the legitimate and substantial claims of constitutional error this case presents. Some of the evidence was in the hands of prosecuting authorities, who failed to disclose it. Other evidence was not heard because Petitioner was represented by attorneys whose representation was notable for its utter disloyalty, sheer ineffectiveness, and/or conflicts of interest. Other evidence was not heard because the witnesses have only now come forward.

The facts upon which this Petition is based could not have been discovered

previously through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(D).  Due

diligence does *not* require that the defendant "leave no stone unturned and no witness

unpursued," Berryman v. Morton, 100 F.3d 1089, 1101 (3d Cir. 1996), and "does not

require maximum feasible diligence, only 'due,' or reasonable, diligence" is required,

DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006).  Due diligence does *not* require

counsel to disbelieve the government's claims about the case or about whether there

is Brady information.  See Banks v. Dretke, 540 U.S. 668, 695 (2004) ("Our decisions

lend no support to the notion that defendants must scavenge for hints of undisclosed

Brady material when the prosecution represents that all such material has been

disclosed."); id. at 696 ("A rule ... declaring 'prosecutor may hide, defendant must

seek,' is not tenable in a system constitutionally bound to accord defendants due

process."); Strickler v. Greene, 527 U.S. 263, 286-87 (1999) ("The presumption, well

established by tradition and experience, that prosecutors have fully discharged their

official duties, is inconsistent with the novel suggestion that conscientious defense

counsel have a procedural obligation to assert constitutional error on the basis of mere

suspicion that some prosecutorial misstep may have occurred." (citations and

quotation marks omitted)).[13]

---

[13]Here, not only did trial counsel request all Brady information in a discovery
letter, see letter to prosecutor Timothy Barron (February 4, 1993), but counsel also
filed a motion specifically requesting that the prosecution "reveal any agreement

Due diligence "is a fact-specific issue the resolution of which depends" upon all of the circumstances and, thus, generally requires evidentiary presentation and development.    DiCenzi, 452 F.3d at 471.    This Court should at least allow an evidentiary hearing on diligence.

The first item of new evidence, the Declaration of Andre Johnson, was obtained on April 3, 2006. Petitioner is filing this Petition within one year of the date of discovery of this first piece of new evidence.  All other evidence in support of this Petition was discovered after that date.  Thus, this Petition is filed within one year of discovery of the new evidence.

Due diligence is established for several reasons.  Underlying evidence was concealed, the witnesses had not come forward before, the State misrepresented facts, and prior counsel were utterly disloyal.  See Claims I, II, III, infra.  Moreover, as to some claims, documents were sealed and facts remain undisclosed even today.  See Claims II, IV, infra.

---

entered into with any witness that could influence his or her testimony." See Motion to Require Prosecution to Reveal any Agreement Entered into with any Witness that Could Influence his or her Testimony.

The State assured prior counsel that it had abided by the requirements of Brady; that it had turned over all exculpatory and impeachment evidence; and that there was no evidence of Petitioner's innocence.  Counsel relied on the prosecution's representations that all such material had been disclosed.

## F.   THIS PETITION SATISFIES 28 U.S.C. § 2244(b)
## (CONCERNING SECOND HABEAS PETITIONS)

This is Petitioner's second habeas petition.  It satisfies the requirements of 28

U.S.C. § 2244(b) concerning second and successive petitions.

Section 2244(b)(1) states: "A claim presented in a second or successive habeas

corpus application under section 2254 that was presented in a prior application shall

be dismissed."   The claims herein were *not* presented in Petitioner's prior habeas

proceedings and, thus, satisfy this requirement.

Since the claims presented herein were not presented before, they must satisfy

§ 2244(b)(2), which states in pertinent part:

> (2)    A claim presented in a second or successive habeas corpus
> application under section 2254 that was not presented in a prior
> application shall be dismissed unless–
> * * *
> (B)(i) the factual predicate for the claim could not have been
> discovered previously through the exercise of due diligence;  and
>
> (ii) the facts underlying the claim, if proven and viewed in light
> of the evidence as a whole, would be sufficient to establish by clear and
> convincing evidence that, but for constitutional error, no reasonable
> factfinder would have found the applicant guilty of the underlying
> offense.

28 U.S.C. § 2244(b)(2).

When a petitioner overcomes this hurdle "as to *one* of his claims, he may

proceed upon his *entire application* in the district court."  Woratzeck v. Stewart, 118

33

F.3d 648, 650 (9th Cir. 1997). Here, Petitioner can overcome § 2244(b)(2) as to *all* of his claims. Petitioner has alleged facts which, when proved, will establish both prongs of the statutory standard – *diligence*, § 2244(b)(2)(B)(i), and *innocence*, § 2244(b)(2)(B)(ii).

### Diligence – § 2244(b)(2)(B)(i)

For the reasons set forth in § E, supra, in connection with diligence requirement of the AEDPA statute of limitations, Petitioner meets the "diligence" standard of § 2254(b)(2)(B)(i).

### Innocence – § 2244(b)(2)(B)(ii)

Petitioner's proffered facts also establish innocence under § 2244(b)(2)(B)(ii). Before discussing those facts, we describe two pertinent concepts.

First, proof of innocence does *not* require that a petitioner show he would have been acquitted of *all* charges made against him in conjunction with the capital charge; a showing of innocence of the capital offense of which the petitioner was convicted is sufficient. See Sawyer v. Whitley, 505 U.S. 333, 343 (1992) (negation of an element of the offense accords with even the "strictest definition" of "actual innocence"). As the Court of Appeals for the Eighth Circuit has explained:

> Although "[a] prototypical example of 'actual innocence' ... is the case where the State has convicted the wrong person of the crime," Sawyer, 505 U.S. at [340], one is also actually innocent if the State has the

34

"right" person but he is not guilty of the crime with which he is charged.
See Schlup, 513 U.S. at [321] (noting prisoner interest in relief "'if he
is innocent of the charge for which he was incarcerated'" (quoting
Kuhlmann v. Wilson, 477 U.S. 436, 452, 106 S.Ct. 2616, 2626, 91
L.Ed.2d 364 (1986) (plurality opinion))).

Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1995) (some citations omitted); see also In

re Minarik, 166 F.3d 591, 607 (3d Cir. 1999) (assuming "that 'actual innocence' of

the crime charged would include the situation where the new evidence would show

the petitioner not guilty of first degree murder, though guilty of some lesser offense").

Second, a petitioner can also meet § 2244(b)(2)'s innocence requirement if he

can show that he is "*innocent of the death penalty*," even if he cannot show innocence

of the underlying offense.  Sawyer, 505 U.S. at 343.  The Court of Appeals for the

Ninth Circuit has explained why this is so:

> [W]e must decide whether a successive petition under 28 U.S.C. §
> 2244(b) as amended by the AEDPA may be used to challenge a death
> sentence, when the newly proffered evidence relates to [eligibility for
> the death penalty] and not to guilt of the homicide.  We interpret the
> AEDPA's amendments to § 2244(b) to permit a petitioner, in a
> successive petition, to establish that he is ineligible for the death
> penalty.
>
> Prior to the enactment of the AEDPA, the Supreme Court
> articulated an "actual innocence exception" to the bar arising from the
> doctrine of "abuse of the writ" against bringing claims in a successive
> habeas petition.  This exception requires that "one must show by clear
> and convincing evidence that, but for constitutional error, no reasonable
> juror would have found the petitioner eligible for the death penalty
> under the applicable state law." Sawyer v. Whitley, 505 U.S. 333, 336

35

(1992). ...

In amending § 2244(b), Congress adopted language similar to that articulated in Sawyer, requiring newly discovered facts which, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."    28 U.S.C. § 2244(b)(2)(B)(ii).

We note the difference between the two standards – "eligible for the death penalty" under Sawyer, and "guilty of the underlying offense" under § 2244(b)(2)(B)(ii) as amended by the AEDPA. ... [W]e must decide whether the scope of the "actual innocence" standard articulated in Sawyer has been superseded by a narrower exception in the AEDPA.

\* \* \*

Under the canons of statutory construction, the similarity of the language between Sawyer and § 2244(b)(2)(B)(ii) potentially cuts both ways.  On the one hand, the fact that the standards are nearly identical suggests that Congress intended to codify the Sawyer standard.  On the other hand, the slight difference between the two could be read as suggesting that Congress intended just the opposite: to enact a provision similar to but more stringent than the Sawyer standard.

However, unlike Sawyer, the standard in § 2244(b) applies to all habeas petitions, not just capital habeas petitions.  For that reason, it would not have made sense for Congress to adopt, without any changes, the Sawyer standard referring to eligibility "for the death penalty," since the statute would have to apply to cases where the petitioner did not receive the death penalty.  Thus, the need to cover non-capital habeas petitions best explains the slight difference in wording between the Sawyer "actual innocence" standard and § 2244(b)(2)(B)(ii).

Furthermore, the "underlying offense" in a death penalty case is capital murder rather than merely homicide.  Under Gregg v. Georgia, 428 U.S. 153 (1976), and its progeny, the special circumstances or aggravating factors making a defendant eligible for the death penalty

36

must be particularly alleged in the indictment.  Thus, by claiming the constitutional infirmity of the lone special circumstance that made him eligible for the death penalty, Thompson is challenging his conviction of the "underlying offense" of capital murder.

Because the words "underlying offense" encompass a charge of capital murder and because of the likelihood that the difference in the language between the Sawyer standard and new § 2244(b)(2)(B)(ii) was to accommodate non-capital as well as capital habeas petitions, we hold that Thompson's claim that he is ineligible for the death penalty due to the constitutional infirmity of the rape conviction, which stands as his sole special circumstance, states a claim under § 2244(b).

Thompson v. Calderon, 151 F.3d 918, 923-24 (9th Cir.) (en banc), cert. denied, 524

U.S. 965 (1998).[14]

### 1.  Innocence of the offense

The State asserted at trial that Petitioner *himself* killed Mrs. Girardi when she

arrived home and discovered him and Lachette burglarizing her house.    That

Petitioner was the killer was the *only* conviction option available to the jury.    The

---

[14]We should note that the Third Circuit has not decided this issue and that there is a split in the Circuits about the issue.  As stated, the Ninth Circuit has held that innocence of the death penalty satisfies the § 2244(b)(2)(B)(ii) standard for second habeas petitions.  The Tenth Circuit has assumed, without deciding, that innocence of the death penalty satisfies § 2244(b)(2)(B)(ii).  LaFevers v. Gibson, 238 F.3d 1263, 1267 (10th Cir. 2001).  The Seventh and Eleventh Circuits, on the other hand, have held that "a petitioner's claim of innocence of the death penalty [is] *not* cognizable under § 2244(b)(2)(B)."  Thompson, 151 F.3d at 924 n.4 (citing Burris v. Parke, 116 F.3d 256, 258 (7th Cir.1997); In re Medina, 109 F.3d 1556, 1565-66 (11th Cir.1997)).  This Court should adopt the Ninth Circuit's well-reasoned approach, as opposed to the parsimonious construction the Seventh and Eleventh Circuits have given the statute.

court's instructions were that the jury had to find either that Petitioner himself

intentionally killed Mrs. Girardi,[15] or Petitioner himself recklessly killed her during

---

[15]The court gave this instruction on intentional murder, 11 Del. C. 636 (a)(1):

Count V charges the defendant with first degree murder, an intentional killing. Count V of the Indictment charges the defendant with murder in the first degree in that on or about the third day of April, 1992, in the County of New Castle, State of Delaware, he did intentionally cause the death of Elizabeth P. Girardi by striking her repeatedly about the head and face with an axe.

The pertinent definition of murder first degree:

A person is guilty of first degree murder when *he intentionally causes the death of another person*.

In order to find the defendant guilty of first degree murder as charged in Count V of the Indictment, you must find the following elements have been established beyond a reasonable doubt:

The first element is that *Robert Jackson caused the death of another person*. In Count V, caused the death of Elizabeth P. Girardi. *By this I mean that this defendant by his own voluntary acts must have brought about this death, which would not have happened but for such acts*. A voluntary act means bodily movement performed consciously or habitually as a result of effort or determination.

The second element is that the defendant acted intentionally; that is, it must have been Robert Jackson's conscious object or purpose to cause death in this case.

If, after considering all of the evidence, you find that the defendant acted in such a manner as to satisfy the elements which I just stated at or about the date and place in question, you should find the defendant Robert Jackson guilty of murder in the first degree as charged

38

the commission of burglary.[16]  The jury had no option (no instructions) regarding

in Count V of the Indictment.  If you do not so find or if you have a reasonable doubt, you should find the defendant not guilty of murder in the first degree.  (NT 3/30/93 at 174-76)

[16]The court gave this instruction on reckless felony murder, 11 Del. C. 636 (a)(1):

Count VII of the Indictment charges the defendant with murder in the first degree in that on or about the third day of April of 1992, in the County of Newcastle, State of Delaware, he recklessly caused the death of Elizabeth P. Girardi in the course of and in furtherance of the immediate flight from the felony of burglary in the second degree by repeatedly striking said victim about the head and face with an axe. ...

In order to find the defendant guilty of murder first degree, as charged in Count VII of this Indictment, you must find the following elements have been established beyond a reasonable doubt:

*The first element is that the defendant caused the death* of Elizabeth P. Girardi, as I have just explained that definition to you under Count V.

The second element is that *the defendant* acted recklessly. A person acts recklessly with respect to death when he is aware of and consciously disregards a substantial and justifiable risk that death will *result from his conduct.* ...

The third element is that the killing occurred during the commission of a felony or immediate flight therefrom.

If, after considering all of the evidence, you find the State has established beyond a reasonable doubt the defendant acted in such a manner as to satisfy all of the elements which I have just stated at or about the date and place in question, you should find the defendant guilty of murder in the first degree as charged in Count VII of the indictment.  If you do not so find or if you have a reasonable doubt, you

liability of an accomplice or liability of one conspirator for acts committed by another. Thus, when the jury found Petitioner guilty of intentional murder and reckless felony murder, it necessarily found that Petitioner was the actual killer.

The new evidence shows that Petitioner is innocent of the killing. The new evidence thus shows that Petitioner is not guilty of the actual offense for which he was convicted and sentenced to death. This evidence includes the recently uncovered admissions by Lachette himself that *Lachette* killed Mrs. Girardi; new evidence about the concealed deals the State struck with Andre Johnson, Victor Talmo and James Burton; and evidence that Petitioner was *physically unable* to wield the axe that killed Mrs. Girardi.

Anthony Lachette killed Mrs. Girardi, and bragged about it afterwards. While Lachette was getting himself a deal by accusing Petitioner of killing Mrs. Girardi and minimizing his own involvement, he was bragging to other people that he killed Mrs. Girardi and had gotten over on the system. While presenting himself as a well-mannered and respectful young man who uncharacteristically decided to flirt with the danger of committing a burglary, Lachette showed himself to others as violent and aggressive, as one who would not be led around by others.

---

should find the defendant not guilty of murder in the first degree under Count VII. (NT 3/30/93 at 176-78)

Lachette spent the months before trial at the Gander Hill Prison and told his cell mate and others that *he* killed Mrs. Girardi.  Lachette told Paul Webber he killed Mrs. Girardi – "and it was very scary the way he said it."  Lachette seemed "devious and totally discompassionate."  Webber recalled that Lachette "somehow blamed the victim for the crime, like he was mad that he had to kill her because she came home."  Paul Webber Declaration ¶ 2.  Lachette also admitted killing Mrs. Girardi to Christopher Desmond and Derrick Johnson.  Lachette said "I did what I had to do," and "would brag ... that he got to the cops first to tell his story so he would get his deal."  Christopher Desmond Declaration ¶ 3-4; Derrick Johnson Declaration ¶ 2-3.  Lachette told Jonathon Freeman that he knew from the beginning that he had to get to the prosecutor with his story before Petitioner.  He told Freeman that he knew he had to kill Mrs. Girardi, who knew *him*, when she drove into the garage – he saw the axe he used right there on the ground.  <u>See</u> Victor Abreu Declaration ¶ 4.

While Lachette portrayed himself to the police and to the jury as incapable of harming Mrs. Girardi, other inmates saw a very different Anthony Lachette.  He was a "very scary guy" who was using drugs even while at Gander Hill, and selling them on the outside.  Paul Webber Declaration ¶ 4.  He was "a bully, arrogant and aggressive;" he threatened Pastor Johnson, saying something along the lines of "doing the same to me as he did on the street."  Derrick Johnson Declaration ¶ 3.

41

Another acquaintance of Lachette, George Gentry, reports that Lachette was violent and "would fly off into a rage for no reason." He used steroids, coke, acid and mushrooms. He would brag about getting kids hooked on drugs, and about how he could get people to do what he wanted. George Gentry Declaration ¶ 6. Lachette was "very violent" – he would "fly off the handle, slamming doors and throwing things around. He would fly into a rage for no reason." Angeline Willen Declaration ¶ 5,7.

James Burton, another cooperating witness for the State, also received a windfall for his testimony that was not revealed to the defense. Cathy Barrett, a friend, describes Burton as a liar, drug addict, drug dealer and thief. "He was just one of those people who you knew you couldn't trust and who would do anything to make sure he was okay regardless of other people." Cathy Barret Declaration ¶ 5. Burton, explains George Gentry, was a drug addict and a liar. "He would lie about really strange things just to make himself look better. ... You just couldn't trust anything James said." George Gentry Declaration ¶ 5.

Other State witnesses, too, testified without the jury ever hearing information that would have shattered their credibility. For example, Andre Johnson, who testified for the State that Jackson asked him to get rid of James Burton, denied at trial that he was receiving any benefit for his testimony. This was false. In his recent Declaration, Andre Johnson describes his meetings with the prosecutors and explains

42

that he understood he would get a good deal.  See, e.g., Andre Johnson Declaration ¶ 4 ("In the meeting with Barron and O'Neill, I was certainly given the impression that they would do something very big for me in terms of my case").  In a pleading that he filed later in his own case, he explained that "Mr. Barron assured me that my chargies (sic) would be disposed of and that he could not put that in writing because if the defense counsel was to find out about this agreement, it would be used to destroy my credibility."  Complaint for Specific Performance, Johnson v. State ¶ 8.  And Andre Johnson told the prosecutors that it was impossible for Petitioner to have committed the act given the injuries he had suffered in the car accident.  They did not want to hear it.

In contrast to Lachette's bragging about guilt, Petitioner ceaselessly asserted his own innocence.  State witness Victor Talmo told the prosecution about this, but it was not disclosed at trial.  See Victor Talmo Declaration ¶ 2.[17]

Lachette's admissions of guilt are corroborated by substantial evidence that Petitioner could not have killed Mrs. Girardi.  Petitioner was in an accident not long before the murder, and had suffered a severe shoulder and arm injury that prevented him from wielding the axe as it was wielded to kill Mrs. Girardi.  See Robert Ashley

---

[17]The State also withheld other significant exculpatory information regarding Talmo, who testified at sentencing.  See Claim III, infra.

Declaration ¶ 7-8, 10.  Declarations of David Gerhardt ¶ 2, 4; Angeline Willen ¶ 4,

7; George Gentry ¶ 2, 4; Robert Ashley ¶ 2; Sharon Montgomery ¶ 3; Andre Johnson

¶ 2.  In the words of Ms. Willen, corroborated by Mr. Gentry and others, Petitioner

"could not do much at all with that arm or shoulder"; "it was never the same."

Indeed, hospital records show that in September 1991 Petitioner had "Recurrent

subluxation of right shoulder following auto accident," and underwent surgery.  See

Riverside Hospital Records.  Mr. Ashley visited Petitioner in prison before trial, and

Petitioner's shoulder was still impaired.  Ashley Declaration ¶ 9.  The prosecutor had

this information; the information was not disclosed.   See, e.g., Andre Johnson

Declaration ¶ 2; Willen Declaration ¶ 7.[18]

What is more, witness after witness describes Petitioner's character and

temperament as non-violent, truthful, respectful, dependable, slow to anger, and even

"sweet" – "the best kind of friend you could have." See Declarations of Sharon

Montgomery ¶ 2, 3; Melissa Pullak, Angeline Willen, ¶ 7; Robert Ashley ¶ 2-3; Cathy

Barrett ¶ 2; Sandra Younker ¶ 2, 4.

All of this evidence demonstrates Petitioner's innocence.  All of it is relevant

---

[18]Petitioner had requested that the Delaware Superior Court order the Department of Corrections ("DOC") to provide the records of his confinement, including the medical records, which may shed light on his injuries and treatments by the DOC.  The Delaware Superior Court denied that motion.  Petitioner will request this Court to order disclosure at the appropriate time.

under § 2244(b)(2)(B)(ii), which looks at "the evidence as a whole."  Lachette, not Petitioner, killed Mrs. Girardi.  Lachette had a strong motive to kill, because Mrs. Girardi recognized him.  Lachette was a man of violent temperament. Lachette was using and selling drugs.  Lachette had the size and physical ability to kill Mrs. Girardi.  Lachette proved himself determined not to be sent to prison.  Even when backed into a corner by the police, he made clear that he was not going to be the one charged with a "fucking murder."

Lachette was smart.  Lachette provided a story to the police that contained enough self-incrimination to be credible under the circumstances.  Otherwise, *Lachette blamed Petitioner for Lachette's own deeds*.

No reasonable juror, in the face of Lachette's admissions and the additional evidence proffered showing Lachette's guilt, in the face of the many witnesses who know that Petitioner's shoulder was seriously injured, in view of the impeachment material about James Burton and Andre Johnson, and given the other evidence discussed in this petition, would have found that Petitioner killed Mrs. Girardi, either intentionally or recklessly.  Thus, the central elements (intent/recklessness) of both charges of capital murder brought against Petitioner do not apply.  Petitioner surely has made a showing of innocence that necessitates federal review, a hearing and, thereafter, relief.

## 2. Innocence of the death penalty

As stated above, § 2244(b)(2)(B)(ii)'s innocence provision is satisfied by proof that Petitioner is innocent of the death penalty. This standard is met by showing that a "*condition of eligibility*" for the death penalty is not met. Sawyer, 505 U.S. at 345.

The trial court sentenced Petitioner to death under 11 Del. C. § 636(a)(2) – that is, for recklessly killing Mrs. Girardi during the course of, or in furtherance of burglary. The jury was asked to find – and the jury found – that Petitioner was the actual killer; thus, the finding of recklessness by jury and court rested upon the determination that Petitioner was the person who struck the blows that killed Mrs. Girardi. Because Petitioner is innocent of that act, the death sentence he received cannot be supported on that theory and Petitioner is no longer eligible for death under the State's theory of prosecution.

Nor would the State be able to prove that Petitioner himself showed a reckless disregard for Mrs. Girardi's life, under Tison v. Arizona, 481 U.S. 137 (1987) and Enmund v. Florida, 458 U.S. 782 (1982), in light of the new evidence. The Eighth Amendment bans "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." Enmund, 458 U.S. at 788 (citations omitted). In Enmund, the United States Supreme Court emphasized that, for Eighth Amendment purposes, the focus had to be on Enmund's culpability, not that of the

46

other perpetrators: we insist upon "individualized consideration as a constitutional requirement in imposing the death sentence." Id., 458 U.S. at 798 (internal quotation marks omitted). The Court held that the Eighth Amendment does not permit imposition of the death penalty on a person who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that killing take place or that lethal force will be employed." Enmund, 458 U.S. at 797. The Court reasoned:

> We have no doubt that robbery is a serious crime deserving serious punishment. It is not, however, a crime "so grievous an affront to humanity that the only adequate response may be the penalty of death." Gregg v. Georgia, 428 U.S.[153], at 184, 96 S.Ct. [2909], at 2930 [(1976)] (footnote omitted). "[I]t does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, [robbery] by definition does not include the death of or even the serious injury to another person. The murder kills; the [robber], if no more than that, does not. Life is over for the victim of the murderer; for the [robbery] victim, life … is not over and normally is not beyond repair. Coker v. Georgia, 433 U.S. [584], at 598, 97 S. Ct. [2861, at 2869 [(1977)] (footnote omitted). As was said of the crime of rape in Coker, we have the abiding conviction that the death penalty, which is "unique in its severity and irrevocability," Gregg v. Georgia, supra, 428 U.S., at 187, 96 S.Ct., at 2931, is an excessive penalty for the robber who, as such, does not take human life.

458 U.S. at 787.[19]

---

[19]The Court also noted: "The evidence is overwhelming that American juries have repudiated imposition of the death penalty" in cases "where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." Enmund, 458 U.S. at 795.

In <u>Tison v. Arizona</u>, 481 U.S. 137 (1987), the Court reiterated that personal culpability for the killing is the focus of Eighth Amendment review. The <u>Tison</u> court stated that the Eighth Amendment requires that the defendant have at least a reckless culpability toward the killing itself, <u>i.e.</u>, a reckless disregard for human life. <u>See</u> <u>Tyson</u>, 481 U.S. at 151, 158. The Court rejected a mere "foreseeability" analysis, because "the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen." <u>Id.</u> at 150-51.

The finding(s) needed under <u>Enmund</u> and <u>Tison</u> cannot be made against Petitioner. First, the State is bound by its theory (indeed, its evidence and the only actual argument it made) at trial. Having asserted that intent and recklessness were proven *because* Petitioner actually killed the decedent, the State cannot constitutionally make a different claim now. <u>See</u> <u>Stromberg v. California</u>, 283 U.S. 359 (1931) (a conviction cannot be justified after the fact on the basis of a different theory of prosecution from the theory the state asserted to the jury); <u>Presnell v. Georgia</u>, 439 U.S. 14 (1978) (death sentence cannot be justified after the fact on the basis of a different theory of aggravation than the theory asserted to the jury).

Second, as to participation in the burglary, the burglary here, unlike the robbery in <u>Enmund</u> and break-out in <u>Tison</u>, was an *unarmed crime*. There is no evidence whatsoever that Petitioner (or even Lachette) went to Mrs. Girardi's home armed with

a weapon, and therefore planned for or contemplated the possibility of violence.  In fact, they took pains to make sure that no one was at home, as Lachette acknowledged.  Further, any participation on Petitioner's part was secondary to Lachette's.  Lachette targeted the Girardi home and directed Petitioner to it; Lachette directed that Petitioner pull the car out of view of the street; and Lachette himself broke into the house.  Thus, the killing of Mrs. Girardi was an unplanned and unilateral response *by Lachette* to Mrs. Girardi's return.  Lachette grabbed a weapon (the axe) that happened to be available.

It is now clear that, in his trial story, Lachette reversed the roles that he and Petitioner played during the incident.  It was Lachette, not Petitioner, who grabbed the axe and committed the killing.  There can be no finding that Petitioner is sufficiently culpable to satisfy the Eighth Amendment under <u>Enmund</u> and <u>Tison</u>.[20]

---

[20]Delaware caselaw and other state decisions support this proposition.  <u>See</u> <u>State v. Rodriquez</u>, 656 A.2d 262 (Del. Super. 1994) (death penalty not permissible where defendant was possibly armed, had been "actively involved in every element of the attempted robbery" and was "physically present during that crime which culminated" in the murder, but there was not evidence that killing was anticipated, that the defendant had fired shots; that violence was expected to erupt; or that defendant could have prevented it); <u>State v. Lacy</u>, 929 P.2d 1288, 1299-1300 (Ariz. 1996) (death penalty vacated where evidence showed defendant's participation in burglary, and that he witnessed the killing of one of the victims; his mere presence at that time, even if defendant stood by and did nothing, did not establish "reckless indifference"); <u>Tennessee v. Branam</u>, 855 S.W.2d 563 (Tenn. 1993) (death sentence reversed where evidence failed to show defendant ever had weapon, or that he participated in confining victim during robbery); <u>State v. Jackson</u>, 575 So.2d 181

The new evidence demonstrates that Lachette, not Petitioner, killed Mrs. Girardi, and there is no evidence that Petitioner was at any point armed, expecting violence, involved in any violence, or prepared to do violence against Mrs. Girardi. The new evidence compellingly shows that Petitioner is not death-eligible.

## G.   CLAIMS FOR RELIEF

Petitioner submits that his conviction(s) and death sentence violate the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  The facts Petitioner proffers demonstrate his entitlement to relief.  Petitioner urges that the Court permit an evidentiary hearing.  See Townsend v. Sain, 372 U.S. 293, 312-19 (1963) (evidentiary hearing required when the habeas petition alleges facts which, if proved, would entitle petitioner to relief, and there is material dispute about those facts); Smith v. Freeman, 892 F.2d 331, 338 (3d Cir. 1989) (same; in making this determination, court must accept petitioner's allegations as true, and view those allegations in the light most favorable to petitioner); Zillich v. Reid, 36 F.3d 317, 321 (3d Cir. 1994) (same); Keller v. Petsock, 853 F.2d 1122, 1128 (3d Cir. 1988) (same).

---

(Fla. 1991) (death sentence overturned where defendant was seen in vicinity of crime scene with his brother, whose fingerprints were later at crime scene, had made incriminating statements that "we had to do it" and had attempted to conceal evidence, but neither established which of two perpetrators possessed or fired the weapon, nor that defendant carried a weapon or intended to harm anyone, nor that defendant expected violence to erupt).

### CLAIM I.    PETITIONER'S CONVICTION AND DEATH SENTENCE VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS INNOCENT.

Petitioner is innocent of the murder and innocent of the death penalty. The courts have never reviewed the vast array of evidence that proves Petitioner's innocence. Some of that evidence was in the hands of prosecuting authorities, who failed to disclose it. Other evidence was not heard because Petitioner was represented by attorneys whose representation was notable for utter disloyalty, sheer ineffectiveness, and/or conflicts of interest. Other evidence was not heard because the witnesses have only now come forward.

Petitioner did not kill Mrs. Girardi; Anthony Lachette did. Petitioner is innocent of reckless felony murder – the crime for which he is sentenced to die – because he did not kill and was not reckless regarding the death that Lachette caused. Indeed, Petitioner is innocent of the death of Mrs. Girardi under any theory of felony murder, and so is innocent of any circumstance supporting a death sentence.

### Petitioner is Innocent of the Death of Mrs. Girardi

As set forth in § F, <u>supra</u>, Petitioner is innocent of murder. Accordingly, his conviction and death sentence violate due process and the Eighth Amendment. <u>See Herrera v. Collins</u>, 506 U.S. 390, 417 (1993) (plurality opinion) (assuming that persuasive demonstration of innocence would render execution unconstitutional and

warrant habeas relief); id. at 419 (O'Connor & Kennedy, JJ., concurring) ("[E]xecuting the innocent is inconsistent with the Constitution. ... [T]he execution of a legally and factually innocent person would be a constitutionally intolerable event."); id. at 432 (Blackmun, Souter & Stevens, JJ., dissenting) (execution of an innocent person "is at odds with any standard of decency I can imagine").

### Petitioner Is Innocent of the Death Penalty

As set forth in § F, supra (discussing Tison and Enmund), Petitioner is innocent of the death penalty, and his death sentence violates due process and the Eighth Amendment.

An evidentiary hearing and relief are appropriate.  (The facts stated within §§ A-F, supra, and those stated within the other Claims raised herein, are incorporated as if having been fully stated in this Claim.)

### CLAIM II.   PRIOR COUNSEL PROVIDED DISLOYAL, CONFLICTED AND INEPT REPRESENTATION AND PETITIONER'S RIGHT TO COUNSEL WAS VIOLATED.

In a criminal case, the "duty of loyalty [is] perhaps the most basic of counsel's duties." Strickland v. Washington, 466 U.S. 668, 692 (1984).  Here, a succession of lawyers eviscerated the duty of loyalty to Petitioner.

**Joseph Hurley**:   Petitioner's first lawyer, Joseph Hurley, entered his appearance on or about July 6, 1992, and formally moved to withdraw on October 5,

1992.  At a motion hearing on November 10, 1992, Hurley asked to go sidebar to state his "primary" reason for wanting to withdraw from the case "in addition to what was contained within the four corners of the motion," Tr. 11/10/92 at 2, which had referred to the great cost Petitioner's family incurred in retaining Hurley.

In the presence of the trial/sentencing judge,[21] the prosecutor and counsel for codefendant Lachette, Hurley then said he had reached the conclusion that *Petitioner was guilty* and "*ought to die.*"  The full text of "defense counsel" Hurley's comments is as follows:

> Your Honor, I've been a defense attorney for seventeen years and I am able to divorce myself emotionally from what I hear in representing a client.  There is one exception to that.
>
> During the proof-positive hearing when I heard for the first time the graphic details that were given with regard to the victim in this case grabbing on to the handle of the axe with both hands while the defendant punched her with his free hand and she dropped to the ground, and then while she was writhing or spasming on the ground, then he struck her numerous times, instantly it brought back a circumstance where during the term of my marriage, my wife and I had a continual conversation regarding security at the house and the garage and her being in the garage.
>
> At that moment, *I felt an absolute sense of revulsion toward the defendant.  I reached the conclusion in my mind he ought to die.*  I identified *I would not sit with him at the table for the remainder of the*

---

[21]The Honorable Vincent Bifferato presided over trial and sentencing proceedings in 1993, the penalty retrial in 1995, and the post-conviction (Rule 61) evidentiary hearings in 1998-99.

*hearing*.

I met with him after that and I was supposed to meet with him that week and *I delayed meeting with him because it was an emotional strain for me to have to meet with him*.

Finally, weeks after I was supposed to meet with him I met with him. *I found him to be distasteful*. I had a conversation with him about the state of the case. Without indicating what he said to me, *the explanations that were given created emotional responses in me* and I don't think that it is fair to him.

I didn't put this in the motion because I thought *it was prejudicial to him for an attorney to say in my estimation he's guilty and he ought to die*. It's the only time it's happened in my life. But nonetheless, it is what it is.

See (previously sealed) Transcript, State v. Jackson, Motion to Withdraw as Counsel (11-10-92) at 4-5. The court granted the motion to withdraw. Id. at 8.

At the time he made these remarkable comments about Petitioner, Hurley was *Petitioner's lawyer*. Moreover, Hurley made these statements to the very judge who would *ultimately sentence Petitioner to death*. And he made these comments knowing, in his own words, that "*it was prejudicial to [Petitioner] for an attorney to say in my estimation he's guilty and he ought to die*."[22]

---

[22] Attorney Hurley told Judge Bifferato this was the first time in seventeen years as a criminal defense lawyer that he had held such negative feelings about a client. Because these comments were made at the bench, Petitioner was unaware of what Hurley was telling the Court. The proceeding was then ordered sealed and only fortuitously came to light within the past year. See Rebecca Blaskey Declaration.

Hurley's remarkable display of disloyalty, and his presentation of prejudicial

information to Judge Bifferato, violated Petitioner's Sixth Amendment right to loyal,

effective counsel. "[T]he duty of loyalty is violated" when, as here, "counsel acts

more for the benefit of, and with more apparent sympathy toward, the prosecution

than the client he is defending. ... [A]n attorney who adopts and acts on a belief that

his client should be convicted 'fail[s] to function in any meaningful sense as the

Government's adversary.'" Fisher v. Gibson, 282 F.3d 1283, 1291 (10th Cir. 2002)

(quoting Cronic, 466 U.S. 648, 666 (1984) and Osborn v. Shillinger, 861 F.2d 612,

624-25 (10th Cir. 1988)).[23]

---

[23]See also Fisher at 1298 (counsel's "hostility toward his client [shows a] ...
blatant and fundamental violation of [the] duty of loyalty"); id. at 1300 (counsel
"demonstrated a ... fundamental violation of his duty of loyalty by exhibiting actual
doubt and hostility toward his client's case"); id. at 1304 ("Implying a client's guilt
... violates the duty of loyalty"); id. at 1309 ("conveying belief in a client's guilt,
eliciting information that presents one's client in a disfavorable light, and conveying
a lack of a desire to defend one's client" violates duty of loyalty and "can greatly
prejudice a defendant"); accord Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997)
(counsel breached duty of loyalty through his "expressions of contempt for his client
for his alleged actions. The effect of this was to provide Rickman not with a defense
counsel, but with a second prosecutor"); Blanco v. Singletary, 943 F.3d 1477, 1500-
05 (11th Cir. 1991) (counsel ineffective when they "revealed confidential, damaging
information" to trial judge – who would ultimately impose sentence – and suggested
that defendant had no mitigation); Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir.
1991) (counsel ineffective when he "attacked his client's character and separated
himself from his client"); Osborn v. Shillinger, 861 F.2d 612, 629 (10th Cir. 1988)
(counsel breached duty of loyalty when he "informed the judge ... that in essence his
client deserved the death penalty"); King v. Strickland, 748 F.2d 1462, 1464 (11th
Cir. 1984) (counsel breached duty of loyalty when he "stressed the horror of the

Because Hurley violated his duty of loyalty to Petitioner, the proceedings were devoid of the adversarial nature required by the Sixth Amendment.  See Fisher, 282 F.3d at 1291; Rickman, 131 F.3d at 1155-56; Osborn, 861 F.2d at 626.  The presumption of prejudice is particularly appropriate here because Hurley made these statements to Judge Bifferato – the judge who presided over the original trial court proceedings and made rulings on motions, admission of evidence, permissible arguments, jury instructions, and so on, and the judge who presided (and made the determinations) at sentencing, resentencing and state post-conviction proceedings. Thus, Hurley's disloyalty *tainted the entire proceedings* by unfairly biasing the judge against Petitioner, a structural constitutional violation that cannot be deemed harmless.[24]

---

crime" and tried to "tried to separate himself from his client"); Douglas v. Wainwright, 714 F.2d 1532, 1557 (11th Cir. 1983) (counsel ineffective where, "[a]pparently failing to appreciate that the trial judge was the ultimate sentencer," counsel told the judge "that not only did counsel have no evidence to proffer at that time but that apparently there was no mitigating evidence that could be produced"); cf. Nix v. Whiteside, 475 U.S. 157, 189 (1986) (Blackman, J., concurring) ("attorneys who adopt the role of the judge or jury to determine the facts, pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment" (citation and quotation marks omitted)).

[24]See Gray v. Mississippi, 481 U.S. 648, 668 (1987) ("We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' ... The right to an impartial adjudicator, be it judge or jury, is such a right." (quoting Chapman v. California, 386 U.S. 18, 23 & n.8 (1967))); Johnson v. United States, 520 U.S. 461, 468-69 (1997) ("lack of an impartial trial judge" is "structural error" that "def[ies] harmless-error analysis"

Even if prejudice were not presumed, it can be established. Judge Bifferato presided over every phase of this case, made numerous discretionary rulings, was the ultimate sentencer and was the fact-finder post-conviction. The Judge's exposure to this highly prejudicial information undermines confidence in the outcome of the proceedings, thus establishing prejudice.[25]

Hurley's assertions also were made in the presence of codefendant Lachette's lawyer *and the prosecutor*. Surely they had an effect on the prosecutor – who cut a deal with Lachette and vehemently went after Petitioner.[26] And just as surely, Hurley's assertions influenced Lachette's lawyer, who knew he had been given a perfect opportunity to nail down the deal for *his* client, Lachette.

(citing Tumey v. Ohio, 273 U.S. 510 (1927))); In re Murchison, 349 U.S. 133, 136 (1955) ("Every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." (quoting Tumey, 273 U.S. at 532)); Taylor v. Hayes, 418 U.S. 488, 501 (1974) ("the inquiry must be not only whether there was actual bias but also whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused" (quoting Ungar v. Sarafite, 376 U.S. 575, 588 (1964))).

[25]Moreover, Judge Bifferato violated due process and the Eighth Amendment by not recusing himself. See previous footnote (citing Johnson, Tumey, Murchinson, Taylor). Due process and the Eighth Amendment were also violated because the Judge failed to disclose these facts to the subsequent attorneys in the case or to the Delaware Supreme Court. It is only by sheer luck that the transcript has now come to light. See Rebecca Blaskey Declaration (discussed below).

[26]Lachette is on the street today, after serving five years for burglary.

Petitioner had no chance to address or rebut Hurley's assertions. While Hurley spoke at side-bar, Petitioner was back at counsel table with security personnel. Neither the court nor anyone else gave him a chance to answer "defense counsel" Hurley's claims. The transcript was then sealed, and it only came to light after the undersigned became involved in this case. As current co-counsel Rebecca Blaskey explains, when she went to the state courthouse in April 2006, to review exhibits from Mr. Jackson's trial:

> The clerk provided us with several boxes containing documents, exhibits and evidence. There were also transcripts. There was a transcript of a conference in which Attorney Hurley was allowed to withdraw from Mr. Jackson's case. When I read the transcript, I was astounded by the comments made by Mr. Hurley to the Court with respect to his client. This document had not been included in any earlier record of Mr. Jackson's case. The transcript was in an envelope that had "sealed" written on it. I did not see this transcript in any records or transcripts from the appellate proceedings in the Delaware Supreme Court, the prior Rule 61 proceedings or the prior federal habeas corpus litigation. I had reviewed those records before going to the clerk's office. The comments were made at side-bar and the court ordered the transcript sealed.

Rebecca Blaskey Declaration ¶ 3; see also United States v. Nixon, 418 U.S. 683 (1974) (special prosecutor satisfied "due diligence" requirement for subpoena *duces tecum* in advance of trial since requested documents were under seal).

**Jerome Capone**: On November 16, 1992, the trial court appointed Jerome Capone and Kevin O'Connell to represent Petitioner. Tr. 7/16/99 at 51. Mr. Capone

then withdrew from the case due to a conflict of interest on or about February 22, 1993, just two weeks before the commencement of Petitioner's trial. Mr. Capone was conflicted because he represented Andre Johnson and Derrick Johnson. Mr. Capone's representation of those two men at the expense of Petitioner then resulted in inculpatory (but false) information being introduced against Mr. Jackson at his trial, and exculpatory (but true) information being kept out. Petitioner discusses each of these conflicts in turn.

*Capone Conflict #1 – Andre Johnson*: After representing Petitioner for a number of months, Capone undertook representation of Andre Johnson on Andre Johnson's own pending charges. Capone then withdrew from Petitioner's case – two weeks before Petitioner's trial – due to the conflict with Andre Johnson. Capone then continued to represent Andre Johnson after withdrawing from Petitioner's case. Capone was called into court during Petitioner's trial when Andre Johnson refused to testify for the prosecution, Tr. 3-23-93 at 331, and *Capone persuaded Andre Johnson to provide testimony against Capone's own former client, Petitioner*. Andre Johnson explains that Mr. Capone advised him to save himself at Petitioner's expense. See Andre Johnson Declaration ¶ 5.

*Capone Conflict #2 – Derrick Johnson*: Capone also represented another witness, Andre Johnson's cousin, Derrick Johnson. Tr. 3/29/93 at 2. Derrick

Johnson, now a pastor, was in custody at Gander Hill with Petitioner and Anthony Lachette and heard Lachette make self-incriminating statements that *Lachette was the killer* ("I'm the one who did it."). <u>See</u> Derrick Johnson Declaration ¶ 3. Derrick Johnson disclosed Lachette's statements to Petitioner's counsel, Kevin O'Connell, who arranged for Derrick Johnson to be brought to court to testify on Petitioner's behalf. <u>See</u> Kevin O'Connell Declaration; Derrick Johnson Declaration.

Capone was brought to court once again, this time to meet with Derrick Johnson. Derrick Johnson met privately with Capone. Derrick Johnson refused to testify. Thus, just as Capone had persuaded Andre Johnson to testify *against* Petitioner, Capone persuaded Derrick Johnson *not* to testify *for* Petitioner.

**Kevin O'Connell**: Mr. O'Connell, who, at the time, had never tried a capital case, was appointed to represent Mr. Jackson at the same time as Mr. Capone in November of 1992. As a newly appointed lawyer in the Superior Court "conflict program," Mr. O'Connell was conflicted because of his perceived duty to the court "not to make waves": "I wanted to express my willingness to take on whatever was handed to me by the Court, and, not put up much of a fuss. Having one of the conflict attorney jobs was something I liked having, and I didn't want to jeopardize that. So I would have to say I didn't want to make waves back then in terms of making problems for the court in cases that were very important." Tr. 7/16/99 at 73.

60

Mr. O'Connell represented Mr. Jackson throughout trial (along with attorney Laurence Levinson, who was appointed upon Mr. Capone's withdrawal), despite being the *witness to Derrick Johnson's statements about the guilt of Anthony Lachette* and the innocence of Petitioner. At a hearing outside the jury's presence, the prosecutor conceded that Derrick Johnson had made exculpatory statements to Mr. O'Connell. After meeting with Capone, Derrick Johnson denied making the statements to Mr. O'Connell. Tr. 3/29/93 at 15-25. Mr. O'Connell did not call Derrick Johnson as a witness at trial. Nor did he himself testify to what Derrick Johnson told him. Thus, the jury never heard about Lachette's confession to Derrick Johnson.

**Laurence Levinson**: Upon Mr. Capone's departure, attorney Laurence Levinson was appointed, just over two weeks before trial, on February 22, 1993. Tr. 7/16/99 at 52. Levinson started talking to the press and revealed that Derrick Johnson would testify about admissions made by Lachette. Tr. 3/29/93 at 20. The press accounts scared Derrick Johnson, who ultimately refused to testify. Id. at 10. Levinson's disclosure to the press was detrimental to Petitioner, where publicity was put above the interests of the client. See Delaware Lawyers' Rules of Professional Conduct, Rule 3.6 ("Trial Publicity") ("A lawyer who is participating ... in the ... litigation of a matter shall not make an extrajudicial statement that the lawyer knows

61

or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.").

**The Public Defender**:  After Hurley filed his motion to withdraw, but before it was granted, Deputy Public Defender Nan Perillo became involved.  Tr. 11/10/92 at 8-9.  Ms. Perillo looked at Hurley's "file" and met with Petitioner before being advised by the prosecutor that *Ms. Perillo's office had a conflict of interest* in the case.  See Nan Perillo Memorandum.  The prosecutor advised Ms. Perillo that he would meet with the judge ex parte to avoid disclosing the identity of the witness or witnesses represented by the Public Defender, to which Ms. Perillo agreed.  Id. Fearing that it would present a conflict for him to preside over the matter, Judge Bifferato assigned the matter to Judge Gebelein for the purpose of determining whether the Public Defender had a conflict.  See Tr. 11-10-92.[27]

The prosecutor then had an off-the-record discussion with Judge Gebelein without Ms. Perillo or Petitioner being present:  "Judge Gebelein then met with [prosecutor] Tim [Barron] in private briefly, and both thereafter told me there is a

---

[27]Ironically, this history is memorialized in the Transcript dated 11/10/92 – the same hearing at which Judge Bifferato heard Hurley say that Petitioner "ought to die." Judge Bifferato was thoughtful enough to recuse himself from the motion on whether the Public Defender had a conflict, but neither recused himself from hearing the Hurley motion nor from Petitioner's case after hearing what Hurley had to say.

definite conflict of interest disqualifying us/ me from representing this defendant." Nan Perillo Memorandum.  Ms. Perillo requested a conference on the record.  The conference appears to have occurred on Nov. 6, 1992.  The transcript, however, has not been made available.  The Public Defender's actual conflict of interest has never been identified in the record.

Petitioner believes, and therefore alleges, that the Public Defender's conflict stemmed from its representation of Victor Talmo, a prosecution informant witness. See Talmo Certificate of Service for a Rule 16 Discovery Request.  The prosecutor's representation to Ms. Perillo that her office had a conflict of interest in representing a witness that needed to be kept confidential demonstrates that Talmo was working as a State agent during the fall of 1992, even though the prosecution and representatives of the New Castle County Police Department, including the lead detective on the case, were representing otherwise *in Petitioner's case*.  See Tr. 9/14/92 at 188-93, 200-08.  (All other informant/witnesses were already represented by counsel other than the Public Defender.)  The known evidence thus indicates that the Public Defender represented Talmo during the time period of Ms. Perillo's memorandum to the Jackson file.  Moreover, according to Mr. Talmo, he had already contacted police by this time and had been sent off with instructions to let the police know about "anything you can come up with."  Talmo Declaration ¶ 3.

63

An evidentiary hearing and relief are appropriate. (The facts stated within §§ A-F, supra, and those stated within the other Claims raised herein, are incorporated as if having been fully stated in this Claim.)

## CLAIM III. THE PROSECUTION WITHHELD EVIDENCE AND ALLOWED MISLEADING AND FALSE TESTIMONY TO GO UNCORRECTED.

The Delaware Supreme Court already has recognized that there was prosecutorial misconduct in this case. See Jackson-3 at 516 (noting the State's "acknowledged and disingenuous prosecutorial practice of implicitly suggesting future possible leniency while maintaining that no actual promise of leniency had been made in order to avoid tainting a witness' credibility because of self-interest"). What was not known earlier, however, was the true extent of the State's pattern of deceit and the evidence of innocence that has now been disclosed.

The prosecution's practice in this case was to make deals with witnesses while suppressing the evidence about those deals, suppressing exculpatory evidence and declining to correct inaccurate testimony. Moreover, several witnesses specifically told the prosecutors that Petitioner was physically incapable of committing the crime, that Lachette actually committed (and admitted committing) the crime, and that Petitioner proclaimed his innocence. The prosecution suppressed this exculpatory evidence and presented a very different picture. The result was the conviction of an

innocent man.

The State's misconduct violated the constitutional protections of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and similar cases. The Supreme Court recently summarized some principles from <u>Brady</u> and its progeny:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused.   <u>See</u> 373 U.S., at 87. ... [T]he <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is "known only to police investigators and not to the prosecutor," <u>Kyles</u>, 514 U.S., at 438.   <u>See id.</u>, at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").   "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) ..., although a "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," <u>Kyles</u>, 514 U.S., at 434.

<u>Youngblood v. Virginia</u>, 126 S.Ct. 2188, 2190 (2006).[28]

---

[28]In assessing <u>Brady</u> materiality, the Court must consider the ways in which *effective counsel* could have used the suppressed evidence, both at trial and through pre-trial investigation and development of other evidence.  <u>Kyles</u>, 514 U.S. at 441 (consider how suppressed evidence could have been used by "competent counsel"); <u>Bagley</u>, 473 U.S. at 676, 683 (consider how suppressed evidence could have been "used effectively" by counsel, including "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case").  Moreover, materiality of evidence is "considered *collectively*, not item by item." <u>Kyles</u>, 514 U.S. at 436.

Trial counsel requested all <u>Brady</u> information in a discovery letter.  <u>See</u> Discovery Letter to Timothy Barron (February 4, 1995).  Counsel also filed a motion specifically requesting that the prosecution "reveal any agreement entered into with any witness that could influence his or her testimony."  <u>See</u> Motion to Require Prosecution to Reveal any Agreement Entered into with any Witness that Could Influence his or her Testimony.  Despite these requests, the State withheld information that was favorable to Petitioner, such as:

**Andre Johnson** testified at trial that Petitioner sent him a letter that, in code, requested that he kill James Burton, another State witness.[29]  Johnson repeatedly testified that the prosecution made him no promises regarding his unrelated pending criminal charges.  <u>See</u> Tr. 3/23/93 at 342; <u>id.</u> at 371 ("the state ain't giving me nothing").  However, this testimony was false.

After providing testimony that assisted the State in securing convictions and a death sentence against Petitioner, Andre Johnson filed a motion for specific performance of his plea deal with respect to his pending charges.  In that motion, he

---

[29]The State may argue that any claim regarding Andre Johnson's hidden deal for cooperation was previously litigated and therefore Petitioner is entitled to no relief.  However, as described below, significant new evidence about Johnson recently has been discovered.  Moreover, additional exculpatory evidence has been developed that dramatically changes the cumulative materiality analysis required by the Supreme Court's <u>Brady</u> law as to all of the relevant facts.

66

described promises made to him by the State in return for his testimony: "And prior to the two detectives and Mr. Barrons (sic) aid stepping in the meeting, Mr. Barron assured me that my chargies (sic) would be disposed of and that he could not put that in writing because if the defense counsel was to find out about this agreement, it would be used to destroy my credibility, sence (sic) I was already a convicted felony (sic)."  Complaint for Specific Performance ¶ 8; Andre Johnson Declaration ¶ 4 ("In the meeting with Barron and O'Neill, ... I was led to believe I would get a very good deal.").

Thus, the prosecution, with the proverbial wink-and-nod, assured Johnson that he would receive consideration for his cooperation.

Even with the undisclosed deal, Johnson was reluctant to testify.  To get him to testify, the State exerted pressure through defense attorney Jerome Capone:

> I said I didn't know anything and I didn't want to testify.  The judge said he could hold me in contempt and they got my lawyer Capone.  They took me in the hallway where he coached and encouraged me to testify. [Prosecutor] O'Neill, I think, was standing a few feet away as we talked. Steven Woods, the prosecutor on my case was in the courtroom.  *I knew that Capone had represented Jackson.  He said don't worry about Jackson - save yourself.*  I thought that was cold blooded.  He said if I went forward I would get a good deal.  So I decided to testify to help myself.  Capone and O'Neill were talking in the hallway while Capone was talking to me.  I couldn't hear what they said.

Andre Johnson Declaration ¶ 5; see also Claim II (discussing Capone's conflicts of

67

interest).

Andre Johnson also told the authorities that *the murder was committed by Lachette, not Petitioner*. "At a meeting with [prosecutors] Timothy Barron and O'Neill, I told them that it was my understanding that Jackson was not the one who did the killing but it was the other guy who was there. I was telling them about how Jackson had been in a car accident and had a shoulder injury. They didn't want to hear any of that stuff. They obviously didn't want me to say that it was my understanding that the other guy did the killing." Id. ¶ 2. This evidence was suppressed by the State, and has only now come to light.

**James Burton** was an important State witness. He testified that Petitioner admitted guilt to him on the day the murder was committed. Thus, Burton's credibility was an important question. The new evidence shows that Burton's claim that Petitioner made an admission to him was *false*. Lachette did the actual act and Petitioner *never* said otherwise.

We also now know that Burton *received benefits from the prosecution*. On June 1, 1995, Burton was arrested and charged with knowingly possessing a Schedule 1 Controlled Substance, Marijuana. He was arraigned on the charge on June 15, 1995, and given a trial date of July 24, 1995. See State v. Burton, 9506000751, CCP Docket. During the same time frame, the prosecution was preparing to proceed in a

resentencing of Petitioner, again trying to get the death penalty imposed.  At an office conference on June 16, 1995, the Court set Petitioner's resentencing date for September.  See Robert Jackson Docket at 19.  On July 24, 1995, Burton's trial date was continued for one month.  On August 25, 1995, just two weeks before he was scheduled to testify for the State, Burton was offered a deal.  See Guilty Plea form, State v. Burton ¶ 17 ("Is your plea the result of a 'plea bargain' with the State?  Yes").  The Attorney General's office agreed to drop the drug charges against Burton and allow him to plead guilty to Disorderly Conduct.  In fact, the Deputy assigned to the case simply changed the information, crossing out the allegations leading to the drug charge and substituting facts to support Disorderly Conduct.  See Information by the Attorney General, State v. Burton.  As a result of this plea bargain, instead of facing time in jail, Burton received a fine of fifty dollars.  See Docket Sheet, State v. Burton. The State did not reveal this to Petitioner's counsel.[30]

**Angeline Willen**:  The State also suppressed material exculpatory statements made by Angeline Willen to the prosecution.  Ms. Willen told the State that Petitioner was always non-violent.  She also told the authorities about a severe injury to

---

[30]Further, according to the Superior Court docket sheet, Carl Roca was arrested on April 28, 1993, a month after he testified for the State in Mr. Jackson's original trial.  See Docket Sheet, State v. Roca.  He was charged with possession of marijuana. On July 12, 1993, the State resolved that case for a fifty dollar fine.  See Disposition, State v. Roca.

Petitioner's arm and shoulder that would have made it impossible for him to have swung an axe in the fashion alleged by the State.

In her Declaration, Ms. Willen states that she was "served with papers" to go to an office in Wilmington to be interviewed. Willen Declaration ¶ 7. She was only seventeen at the time (Mr. Jackson was eighteen at the time of the offense), and her father was upset that he was not permitted into the interview with her. Id. She was interviewed by a member of the Attorney General's office, whom she believes was named O'Neill. "He kept asking me over and over in different ways if Bobby was ever violent toward me. He was not and I kept telling O'Neill that. He was obviously not happy with my answers." Id. She also states that the interviewer was "trying to get [her] to say things about Bobby that weren't true." Id.

In her Declaration, Ms. Willen describes the severity of the injury to Petitioner's shoulder:

> I remember Bobby having a car accident sometime in the summer before my senior year. He was hurt badly and went to the hospital at Riverside. I was with him after he was released from the hospital and he was in pretty bad shape. His arm and shoulder were all black and blue and in a sling. He was in a lot of pain. He had a gash in his head. It was toward the back of his head. It had been stitched up and looked a couple inches long. His hair was all matted and there was dried blood all over. It didn't look like he was treated properly at the hospital. After that, he always had trouble with that shoulder and with his arm. He had been working as a painter. He could not do that anymore because of his shoulder and arm. The injury to his shoulder and arm was extremely

serious.

I remember he had an operation on his shoulder some months later. I was actually on my way to see him at the hospital, when I had a car accident myself and didn't get to the hospital to see him. I remember after that he did rehab for awhile for his shoulder. He also used to do exercises at home on his shoulder. He could not do much at all with that arm or shoulder. He was depressed over this shoulder injury. He was always very active and played sports. After the accident, he couldn't do anything. He couldn't lift things or swing his arm or lift his arm in the air. He could not use his shoulder or arm to do much of anything, even after the rehab.

Id. ¶ 3-4. She told the prosecutor about Mr. Jackson's injury and the condition of his arm. Id. ¶ 7. The prosecution never turned this information over to the defense.

**Victor Talmo** testified for the State at both of Petitioner's sentencing hearings. Talmo, like Andre Johnson, testified that Petitioner sent him a "coded" letter asking him to kill Burton. As was the case with Andre Johnson's testimony, Talmo's testimony about the supposedly coded meaning of the letter, and, thus, *Talmo's credibility*, was critical to the State's case.

As with the other witnesses described herein, the State withheld evidence about Talmo and allowed Talmo to make misrepresentations. Indeed, the State withheld evidence that would have *precluded Talmo's testimony altogether*.

*Suppressed impeachment and exculpatory evidence*: When Talmo testified at Petitioner's first sentencing hearing, he faced a severe sentence under Delaware's

habitual offender statute – a *minimum of eighteen-to-twenty years* and up to *life in prison* for a string of burglaries.  Joseph Funk Declaration ¶ 3.[31]  Before trial, the prosecutors told Talmo they would help him on the pending case in exchange for his testimony against Petitioner.  <u>See</u> Victor Talmo Declaration ¶ 4 ("They said they can't make any promises but they would talk to the judge on my behalf and do what they could for me in return for my cooperation.  I was certainly led to believe they would help me out."); Joseph Funk Declaration ¶ 2 ("[I]t was my practice to get some assurances from the prosecution before allowing my client to cooperate.  I honestly would have had a fairly good idea of specific ranges of numbers for sentencing.  And I certainly would have discussed that with my client.  It is my recollection that in this case, that is how the events transpired.").  At the same time, the prosecutors instructed Talmo to deny that any promises were made to him in return for his testimony.  <u>See</u> Talmo Declaration ¶ 4 ("During the prep sessions, the A.G.'s wanted to be sure that I testified that I wasn't made any promises.  I knew that was the way they did things.").

When Talmo testified at the first sentencing hearing, in accord with the prosecutors' instructions, he *repeatedly (falsely) denied that he was being offered any deal* in return for his testimony.

_____

[31]Funk was Talmo's attorney in the case for which he awaited sentencing.

After Talmo's testimony at the first sentencing hearing, the prosecution made good on the secret promise it had made to Talmo. Instead of the life in prison he faced, he was sentenced to a total of *two and a half years* imprisonment plus one year in a half-way house. See Talmo Sentencing Documents.

Talmo testified again at the second sentencing hearing. As instructed by the prosecution, he (falsely) claimed that the light sentence he had already received was *not* the result of a deal with the prosecution. As instructed, he also claimed there was no deal for his current testimony. See Tr. 9/20/95 at 61, 62-63. That, too, was false. Before Talmo testified at the second sentencing, he obtained assurances from the State that his sentence would be *further reduced* if he testified against Petitioner. See Joseph Funk Declaration ¶ 4 ("I still represented Mr. Talmo in 1995 when he testified again. ... Again, consistent with my practice, I would have gotten some assurances about what benefits he would receive for testifying.").

After his testimony at the second sentencing, Talmo sought a modification of sentence. See Talmo Motion for Reduction of Sentence; Joseph Funk Declaration ¶ 4. As the State had promised before his testimony, it did not oppose the request. See Joseph Funk Letter to Judge Alford (December 1, 1995); Joseph Funk Declaration ¶ 4. The court granted the request, and the remainder of Talmo's sentence was reduced to *house arrest*. Joseph Funk Declaration ¶ 4. Thus, at the second sentencing, Talmo

73

continued to receive benefits for his cooperation, benefits that he knew about while he testified, and continued, at the behest of the State, to deny.

In addition to suppressing impeachment evidence about deals with Talmo, the prosecution also suppressed exculpatory information it obtained from Talmo. Talmo explains that the police and prosecutors continually pressed him to say that Petitioner had confessed to killing Mrs. Girardi, even though he knew otherwise, and he repeatedly told them that Petitioner consistently denied killing her. See Victor Talmo Declaration ¶ 2-4 (Petitioner "never told me he committed the crime, in fact, he was always adamant that he didn't do it. ... [T]he authorities asked me many times if Jackson ever confessed to killing the woman. I told them over and over that he always denied doing it. They were obviously trying to get me to say he confessed but he never did and I never told them that he did. ... The A.G.'s also asked me over and over if he admitted to the crime. I kept saying no because Jackson always maintained that he didn't kill the woman."). This evidence, which is directly relevant to the question of guilt, was never turned over to the defense. This evidence is also powerful impeachment evidence, since it would make the jury question why a man who maintained his innocence would put a hit on one of the witnesses against him.

*Suppressed evidence that would have required preclusion of Talmo's testimony*: The State's misconduct with respect to Talmo was not limited to the

above-described suppression of exculpatory and impeachment evidence. The State suppressed information which, if revealed, would have required complete preclusion of Talmo's harmful testimony.

On Petitioner's first direct appeal, the Delaware Supreme Court vacated the death sentence because part of the State's evidence at the first sentencing was audiotapes of telephone conversations between Jackson and Talmo, which Talmo had surreptitiously recorded in March of 1993. The Delaware Supreme Court found that Talmo was *acting as a state agent in March of 1993*, when he recorded the conversations and, thus, introduction of the information Talmo obtained at that time violated the Sixth Amendment under Massiah v. United States, 377 U.S. 201, 206 (1964), and similar cases. See Jackson-1 at 1369-77.

While finding that Talmo was a state agent in March 1993, the Delaware Supreme Court, based upon the information then available to it, also held that Talmo was *not* a state agent in September of 1992, when he first provided information to the police; and that it was an *open question* as to whether he was a state agent between September 1992 and March 1993. See Jackson-1 at 1376. The Delaware Supreme Court left it to the Superior Court to determine, on remand, if Talmo was a state agent during those times. Id.

On remand, after a hearing at which Talmo and his police contact, Detective

75

McLaren, testified, Tr. 9/14/95 at 148-253, the Superior Court concluded that Talmo was *not* acting as a state agent between September of 1992 and the time of his release from custody in February of 1993; the Superior Court thus permitted Talmo to testify at the second penalty hearing to events that allegedly occurred during that time.

The Superior Court's conclusion, and the admission of Talmo's testimony, was based on testimony from Talmo and Detective McLaren that "detectives did not offer a deal to Talmo nor did they provide him with any directives." State v. Jackson, 684 A.2d 745, 752 (1996).  Talmo now admits that this testimony was false.

As stated above, Talmo was "offer[ed] a deal," but the State suppressed the evidence.  Talmo was also "provide[d] with ... directives," from the time of his earliest meetings with detectives in September 1992, but the State suppressed that evidence too.

Talmo's first meeting with Detective McLaren, the lead detective in charge of the Jackson case, was on September 21, 1992.  See Jackson-1, 643 A.2d at 1369-70. After that meeting, Talmo gathered information from Jackson, which Talmo's girlfriend would in turn relay to police.  Tr. 9/14/95 at 231-33.  Talmo's association with police was as a state agent beginning, at least, as early as the date of that meeting.  According to information provided recently by Talmo, McLaren "wore a uniform so no one in the prison would know I was cooperating with the authorities."

Victor Talmo Declaration ¶ 3. "I know the authorities asked me many times if Jackson ever confessed to killing the woman. I told them over and over that he always denied doing it. They were obviously trying to get me to say he confessed, but he never did and I never told them that he did. *McLaren basically said to me anything you can [come] up with let me know*." Id.

The fact that Talmo was cooperating with police against Jackson in the Fall of 1992 is further demonstrated by Deputy Public Defender Nan Perillo's memo to the Jackson file dated November 9, 1992. See Nan Perillo Memorandum. According to Ms. Perillo, prosecutors informed her that the Public Defender's Office had a conflict of interest in representing Petitioner due to the Office's representation of a witness or witnesses whose identities the State wished to keep confidential. One of the witnesses clearly was *Talmo*, who the Public Defender began to represent in August of 1992. See Talmo Motion for Reduction of Bail. It was Ms. Perillo's belief "that the witness(es) in question is/are inmate(s), who will be testifying to statements allegedly made by Jackson at Gander Hill." Id. at 1. Talmo, Jackson's cellmate, fit that description.[32]

The record now shows that Talmo was a State agent throughout the time he

---

[32]The State's other in-custody witness, Andre Johnson, was represented by Jerome Capone. Moreover, it appears that Talmo was the only witness in the case represented by the Public Defender.

solicited information from Petitioner, but the State suppressed the evidence of that relationship.  The truth is that *all* of Talmo's testimony violated the Sixth Amendment under <u>Massiah</u> and related cases, and should have been precluded.

**Summary**: The prosecution suppressed significant impeachment evidence about its witnesses, the credibility of whom was critical in this case; the prosecution suppressed evidence about its sentencing witness, Talmo (regarding his status as an state agent), that would have required complete preclusion of his testimony; the prosecution suppressed evidence showing that Petitioner was physically incapable of committing this offense; and the prosecution suppressed exculpatory evidence, including evidence that Lachette, not Petitioner, was the actual killer.  All this undermines confidence in Petitioner's capital conviction and death sentence.  <u>See</u>, <u>e.g.</u>, <u>Kyles</u>, 514 U.S. at 445 (stressing importance of impeachment evidence); <u>Banks v. Dretke</u>, 540 U.S. 668 (2004) (same).  The evidence is material.  Moreover, materiality must be viewed in light of the substantial newly developed evidence that shows Mr. Jackson's innocence.

An evidentiary hearing and relief are appropriate.  (The facts stated within §§ A-F, <u>supra</u>, and those stated within the other Claims raised herein, are incorporated as if having been fully stated in this Claim.)

**CLAIM IV.  PETITIONER WAS DENIED DUE PROCESS WHERE THE SENTENCING JUDGE RELIED UPON A PSYCHOLOGICAL OR PSYCHIATRIC REPORT THAT WAS NOT DISCLOSED TO THE DEFENSE; WHERE PETITIONER HAS BEEN DENIED ACCESS TO HIS OWN PRISON MEDICAL RECORDS; AND WHERE THERE WAS JUROR MISCONDUCT BUT THE STATE HAS DENIED PETITIONER ACCESS TO THE JURY TO INVESTIGATE THE MISCONDUCT.**

The state court improperly sealed a mental health report that was considered by the sentencing court.  Petitioner's counsel have never been given access to this report.  The state court has also declined to allow Petitioner access to his own prison medical records, which may contain information relevant to this mental health issue, as well as to Petitioner's claim of innocence.  Further, the state court has (up to this point) refused to allow Petitioner access to jurors to investigate juror misconduct taking place during his trial and sentencing.  These restrictions have denied Petitioner due process.

A.     The Sealed Mental Health Report

The docket sheet in Mr. Jackson's case indicates that the trial court issued an order sealing a psychological/psychiatric report.  See Jackson Docket at 16.  This report "was apparently performed as part of a presentence investigation."  Letter of Attorney General (5/2/06).  This report, apparently used by the sentencing court, has never been disclosed to defense counsel.  See Declaration of Kevin O'Connell, Esq. ¶ 11 ("If I had known about the existence of a report, I would have requested that it

79

be unsealed and provided to the defense, would have objected to the court's reviewing undisclosed information and would have corrected any adverse comments in such a report or presented additional matters").  The court's use of an undisclosed report that Mr. Jackson had no opportunity to contest or refute violates due process and Mr. Jackson's Eighth Amendment protection against arbitrary imposition of the death penalty.[33]

In Gardner v. Florida 430 U.S. 349 (1977), the Supreme Court held that a death sentence is unconstitutional when based, even in part, on "information which [the defendant] had no opportunity to deny or explain." Id. at 362.  The Court stated that "[t]he risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted ... is manifest." Id. at 359.

> Finally, [the state] argues that trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information.  However acceptable that argument

---

[33]Petitioner recently requested that the Delaware Superior Court unseal this report and provide it to counsel.  The State objected.  See Letter of Attorney General (5/2/06).  In its resolution of Petitioner's request for this and for institutional and medical records (which the state court also denied), the state court said that the "Prothonotary cannot presently locate this report." State v. Jackson, 2006 WL 1229684, Letter Order at 5 (May 3, 2006).  Further, the state court surmised that the report could have been generated by a defense expert who testified at the penalty phase.  Id.  There would have been no reason to seal the report of an expert who testified for the defense in open court.  Indeed, the State's version – that this report was part of a pre-sentence investigation, see Letter of Attorney General (5/2/06) – makes much more sense.

80

might have been before <u>Furman v. Georgia</u>, it is now clearly foreclosed. Moreover, the argument rests on the erroneous premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts. Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases.

<u>Id.</u>, 430 U.S. at 360 (footnote omitted).

Mr. Jackson's case is controlled by <u>Gardner</u>. The defense has had no knowledge of this report and no opportunity to deny or explain the report's information and conclusions. As the Third Circuit recognized in <u>Marshall v. Hendricks</u>, 307 F.3d 36 (2002):

The United States Supreme Court, in requiring full disclosure of presentence reports in capital proceedings, emphasized that a process that entrusted the interpretation of the report to a trial court's discretion without allowing for the advocacy of defense counsel was based on [an] "erroneous premise."

<u>Id.</u> at 50 (relying on <u>Gardner</u>); <u>see also</u> <u>Proffitt v. Florida</u>, 685 F.2d 1227 (11th Cir. 1982) (vacating death sentence due to psychiatric evidence that appellant had no opportunity to rebut).

The error here becomes even more clear when considered along with the recent evidence showing that Petitioner has been diagnosed as suffering from organic brain damage. <u>See</u> <u>infra</u>. Had the state court originally turned over the report to counsel

as required by <u>Gardner</u>, it well could have provided counsel with a basis from which

to request neuropsychological testing, which would have shown this brain damage.

### B.    Petitioner's Brain Damage.

Petitioner has now been evaluated by a highly qualified neuropsychologist, Dr.

Carol Armstrong, who explains that Petitioner is brain damaged:

> The information about Mr. Jackson known from the date of his initial arrest already showed that neuropsychological testing was necessary to assess the issue of brain damage.  For example, Mr. Jackson has an extensive history of head injuries, including the head trauma in the accident referred to earlier, which also resulted in substantial injury to his shoulder and arm.

> Results diagnostic of his neuropsychological deficits included impairments in:  confrontational naming; information processing speed (multi-tasking requiring regulatory attention); visuospatial attention/tracking; and impairment in mental spatial rotation, which was severe.

> Mr. Jackson is a 32 year old, right handed man.  Relevant information provided in the clinical interview with him on 4/30/06 included the following.  Mr. Jackson reported no unusual childhood illnesses, poisonings, persistent ear infections, or severe febrile episodes.  He reported a head injury at the age of 8 or 9 years, when he was hit in the head by a boy swinging a bat.  He has no recall of this accident, but was told about it by family members.  He was also hit in the head by his father occasionally between the age of six years until he was nine, when his parents divorced.  He stated that his father would slap him in the face at first, but later came to punch him in the face and head with his fist, and later hit him in the head with the handle of a gun.  Another time his father picked him up and threw him against a wall.

> *In 1991, when Mr. Jackson had just turned 18 years old, he was*

*involved in a serious truck accident as an unrestrained front passenger. The truck was going fast at about 11:30 at night. The truck veered into a field, and hit a ditch or culvert by the road. The truck rolled several times; Mr. Jackson recalls that the truck rolled nose first, before spinning onto its side. The windshield had broken, and Mr. Jackson recalled that a back seat speaker metal part had molded onto the back of his head. He also seriously injured his shoulder and arm in the accident, resulting in loss of mobility. Symptoms of head injury were dazing, dizziness, headache, imbalance, and lethargy (he was "groggy"). He reported that he became unconscious when the ambulance came, and remained so until he was treated in the hospital, approximately one hour later. The next day he slept all day, indicating lethargy and the possibility of raised intracranial pressure. It is possible that Mr. Jackson does not have full self-awareness and may underestimate his injuries.*

In summary, the neuropsychological test results, as corroborated by the history, indicate that Mr. Jackson suffers from neurocognitive impairments, i.e., brain damage. The evidence of his brain dysfunction could have been presented at his original trial and resentencing. A neuropsychological battery such as the one I performed was available at those times. His brain damage is consistent with his history of head injury. His brain damage undermines cognitive functions, impairs his ability to think clearly and makes him susceptible to manipulation and pressure.

Carol Armstrong Declaration ¶ 8-12.

Organic brain damage is clearly mitigating evidence, as it highlights that the defendant has psychological deficiencies. Evidence that Mr. Jackson is brain damaged could have been used to rebut or explain the psychological report that the sentencing court had. The error necessitates a hearing and relief.

### C.    Restrictions on Testing Procedures and Denial of Medical Records.

Petitioner has been denied the opportunity to investigate his claims for relief.

Dr. Armstrong was prevented from conducting a complete evaluation and Petitioner

has been denied access to his prison medical records.

### 1.    The limits on Dr. Armstrong's evaluation

In her Declaration, Dr. Armstrong explains how the prison impeded her from

conducting a complete evaluation of Mr. Jackson's brain damage and organic

impairments:

> The prison personnel only permitted the evaluation to take place with
> his hands being shackled throughout the visit, though I requested that
> the shackles be removed at the time of the evaluation, and although this
> had been previously requested on my behalf by his counsel.  The
> handcuffs were sharply compressing his skin.  It is important to note that
> the hand shackles limited the types and numbers of tests that could be
> given, as many tests require free use of the hands to write, draw, and
> manipulate objects.  Thus, this evaluation was a nonstandard evaluation
> because of its incompleteness.
>
> Although, as I describe later, there are sufficient diagnostic test results
> demonstrating that Mr. Jackson suffers from neurocognitive
> impairments, i.e., brain damage, a full assessment of the extent of all of
> his impairments was not possible because of these constraints.  Due to
> the constraints imposed on the evaluation, the tests likely missed Mr.
> Jackson's full neurocognitive deficits, i.e., it was an inadequate way of
> assessing fully his brain functions.  One important historical factor is
> that Mr. Jackson was involved in a vehicle accident with symptoms of
> head injury.  The trauma included a blow to the back or right side of his
> head from a heavy object in the back of the truck cab; other head injuries
> may also have occurred.  The test battery given on 4/30/06 could not

include the usual tests of visuospatial functions, and it is these functions that would be most at risk from an injury to the back or right side of his head. Also, the battery could include no tests of executive functions, which is a critical aspect of neuropsychological testing of any neurological condition. Such tests require the patient to manipulate novel test stimuli, and this kind of manipulation could not occur while he was shackled. Memory testing and language testing were also limited by the lack of use of his hands.

It is appropriate for me to have the opportunity to test Mr. Jackson fully without these constraints in order to fully assess his neuropsychological deficits and functioning.

Armstrong Declaration ¶ 3-5.

### 2. Denial of access to his own medical records.

Mr. Jackson has also sought access to his prison medical records and requested that the Superior Court issue an order granting him such access. In a letter to Judge Cooch written on May 2, 2006, the Attorney General's Office indicated that it had "no objection to the release of the medical records to defendant's counsel." See letter of Attorney General (5/2/06). Nevertheless, on May 3, the court *denied access* to those records. See Letter Order (May 3, 2006).

The prison records could provide important documentary evidence relating to Mr. Jackson's brain damage. Further, the records could provide valuable information about the effects of the injury to Mr. Jackson's arm and shoulder as a result of the car accident. There is no justification for hiding those records from the defense.

85

Petitioner should be allowed access to his own records and the opportunity for a complete neuropsychological evaluation.

### D.    Juror Misconduct.

Petitioner submits that there was misconduct affecting the jury during the proceedings resulting in his conviction and death sentence.  This issue necessitates a hearing and relief.  Petitioner should be allowed the opportunity to develop this issue.  However, Petitioner has also been denied the right to fully investigate his claim that he was denied the right to a fair trial before an impartial jury.

During Petitioner's trial and sentencing there were incidents which raise serious questions about the jury's ability to fairly weigh the evidence and reach a verdict free of taint.  For example, during the testimony of the medical examiner, the prosecution showed graphic slides of the victim to the jury.  At this point, Juror Saunders became hysterical and left the courtroom.  The court took a recess at 3:32 p.m.  Tr. 3/24/93 at 521.  The rest of the jury was then placed in the same room with the hysterical juror for the next half hour.  The judge described the juror: "She was hysterical.  She was sitting there hysterical.  I'll give her another five or ten minutes and then I'll ask her again ... Because of the emotional outbreak that she had when we called her back in, I'm going to excuse her."  Id. at 523-524.  However, the court did not excuse her until after four o'clock.  Id. at 525.  ("Juror Saunders returns to the

courtroom at 4:04 o'clock p.m.").

Thus, for over half an hour, the hysterical juror was in the jury room with the rest of the jurors. She was so hysterical that when finally dismissed she stated that she was going straight to her doctor. Id. at 526. Surely, such an emotional situation would have affected the impartiality of the remaining jurors. The court, however, did not inquire as to what occurred in the jury room. In fact, the court directed the remaining jurors to keep silent about what happened: "I don't know what went on in the jury room with Mrs. Saunders, and I don't want you to tell me ..." Id. at 526. Thus, Petitioner was unable to explore the very real likelihood that Juror Saunders was consoled by her fellow jurors during their half-hour confinement together, or what discussions actually took place in the jury room.

Another incident further supports Petitioner's claim that his right to an impartial jury was violated. At the start of the second penalty phase, it came to the court's attention that one of the jurors read an article in the morning paper about the case. The juror, upon questioning by the court, indicated that the article worried him "about his family ... the fact that someone offered money for a witness." Tr. 9/15/95 at 6. Obviously, the "fact" that he was referencing was an allegation that Mr. Jackson supposedly offered money for the killing of a witness. The juror should have been excused. Moreover, the rest of the jury should have been questioned about whether

the juror talked about these extraneous facts in the jury room then or during deliberations. Indeed, the court compounded this error by telling the entire jury, including the juror who read the article, that a press "story may be one hundred percent accurate." Id. at 9.

The right to a trial before an impartial jury is at the heart of the protections afforded by the Constitution. See, e.g., Lovett v. State, 516 A.2d 455, 475 (Del. 1986) ("If only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury").

These examples of improper influence on Petitioner's jury show, at least, that counsel should be granted permission to interview the jurors to further develop the prejudice related to this claim.[34] The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") highlight that post-conviction counsel have a duty to interview jurors:

> Collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation...[T]he trial record is unlikely to provide a complete or accurate picture of the facts and issues in the case. That may be because...of juror misconduct.

---

[34]The Delaware Rules of Professional Conduct do not permit counsel to communicate with jurors unless permission is granted by the court. Id., Rule 3.5(C). In the Rule 61 petition currently pending before the Delaware Superior Court, Petitioner has requested that the court grant permission to conduct this investigation by interviewing jurors. That request has not yet been addressed by the court.

ABA Guidelines, commentary to 10.15.1.  In addition:

> Counsel investigating a capital case should be particularly alert to the
> possibility that, notwithstanding surface appearances, one or more jurors
> were unqualified to sit at either phase of the trial and make every effort
> to develop the relevant facts, whether by interviewing jurors or
> otherwise.  Such inquiries can be 'critical in discovering constitutional
> errors.'

ABA Guidelines, n.260 (citing Hertz & Liebman, FEDERAL HABEAS CORPUS
PRACTICE AND PROCEDURE, 4TH EDITION, at 489 n.40).  In short, "[c]ounsel *must*
investigate the possibility that the defendant was judged at either the guilt or penalty
phases by one or more jurors who were not impartial."  ABA Guidelines, n.197.

     Petitioner's constitutional rights to a fair and impartial trial and sentencing
were violated by these improprieties.  At the very least, the Court should grant a
hearing.  See Smith v. Phillips, 455 U.S. 209, 215 (1982) ("This Court has long held
that the remedy for allegations of juror partiality is a hearing in which the defendant
has the opportunity to prove actual bias.").

     An evidentiary hearing and relief are appropriate.  (The facts stated within §§
A-F, supra, and those stated within the other Claims raised herein, are incorporated
as if having been fully stated in this Claim.)

## H.   PRAYER FOR RELIEF

Based on the above, Petitioner, through counsel, prays that the Court:

1.      Grant an evidentiary hearing on the substantive and procedural issues involved in this case;

2.      Grant discovery which may be necessary to the full and fair development of the substantive and procedural issues in this case;

3.      Grant habeas relief as to Petitioner's unconstitutional conviction and/or death sentence.

Respectfully submitted,

/s/ Michael Wiseman

MICHAEL WISEMAN
BILLY H. NOLAS
REBECCA BLASKEY
SHAWN NOLAN
DAVID WYCOFF
Assistant Federal Defenders
MAUREEN K. ROWLEY
Federal Defender
Federal Community Defender Office
For the Eastern District of Pennsylvania
Suite 545 West - Curtis Center
601 Walnut Street
Philadelphia, PA 19106

Dated: April 2, 2007

CERTIFICATE OF SERVICE

I, Michael Wiseman, counsel for Mr. Jackson, do hereby certify that on this 2ND day of April, 2007, I caused a copy of this petition to be served by United States Mail, first class, to the offices of the following attorney:

Loren C. Meyers, Esquire
Deputy Attorney General
820 North French Street, 7th Floor
Wilmington, DE 19801

/s/     Michael Wiseman

_____

Michael Wiseman